PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

v.

PHILLIP WINDOM OFFILL, JR.,

        *Defendant-Appellant.*

No. 10-4490

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Liam O'Grady, District Judge.
(1:09-cr-00134-LO-1)

Argued: September 23, 2011

Decided: December 6, 2011

Before TRAXLER, Chief Judge, and WILKINSON and
NIEMEYER, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Chief Judge Traxler and Judge Wilkinson
joined.

## COUNSEL

**ARGUED:** George Kostolampros, VENABLE, LLP, Wash-
ington, D.C., for Appellant. Patrick Friel Stokes, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C.,

for Appellee. **ON BRIEF:** Ronald M. Jacobs, Stephen H. Swart, VENABLE, LLP, Washington, D.C.; Michael S. Nachmanoff, Federal Public Defender, Kevin R. Brehm, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Neil H. MacBride, United States Attorney, David B. Goodhand, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; Lanny A. Breuer, Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

## OPINION

NIEMEYER, Circuit Judge:

A jury convicted Phillip Offill on one count of conspiracy to commit securities registration violations, securities fraud, and wire fraud, in violation of 18 U.S.C. § 371, and nine counts of wire fraud, in violation of 18 U.S.C. § 1343. The indictment alleged that Offill had participated in a "pump and dump" securities scheme, which was designed to evade securities registration requirements, artificially inflate the value of securities, and then realize a gain by selling them at the inflated value to the public. The district court sentenced Offill to 96 months' imprisonment, a downward variance sentence.

On appeal, Offill contends that the district court erred during trial by (1) admitting opinion testimony of two experts and two lay witnesses for the government; (2) denying his request for a multiple conspiracy instruction; and (3) admitting evidence of subsequent acts not charged in the indictment. Offill also challenges the reasonableness of his sentence, arguing, among other things, that the district court impermissibly imputed to him the gain resulting from the entire conspiracy when calculating the applicable offense level under U.S.S.G. § 2B1.1.

For the reasons that follow, we affirm.

I

In March 2004 David Stocker, a securities lawyer in Phoenix, Arizona, retained Phillip Offill, a lawyer and securities specialist who had earlier worked for the Securities and Exchange Commission, to advise him on how to issue free trading (unrestricted) stock without the need of filing a registration statement. Stocker represented "penny-stock" companies for whom the securities registration process was too costly. Offill explained to Stocker that he could use Rule 504 of Regulation D of the Securities Act of 1933 and an analogous Texas state law, Texas Administrative Code ("TAC") § 139.19, to create free-trading stock and avoid any requirement of registration. More specifically, Offill advised Stocker that Rule 504 and TAC § 139.19 provided an exception to registration requirements when the stock is sold to an "accredited investor" who purchases the stock with "investment intent." As Offill explained, an "accredited investor" was a person with a net worth of $1 million or a business owned by persons each with a net worth of $1 million, and "investment intent" was generally demonstrated by holding a stock for a period of at least one year.

Under the working arrangement between Stocker and Offill, Offill orchestrated 51 stock issuances with Stocker during the period from April through August 2004, and Offill, through investment entities he controlled, served as the initial "accredited investor" in those transactions. Stocker and Offill produced legal opinion letters and stock subscription agreements for the transactions, asserting that the registration exemptions of Rule 504 and TAC § 139.19 applied to the transactions; that Offill, as an accredited investor, had paid for the stock; that the entity that Offill controlled had purchased the stock with "investment intent"; that Offill had no present intention of selling the stock; and that the transactions were not part of a "scheme or plan to evade registration require-

ments." At Offill's suggestion, Stocker included a statement in his opinion letters noting that Stocker was not providing an opinion as to the stock purchasers' status as underwriters. For each transaction, Offill also created documents permitting Stocker to transfer the shares.

Offill received $2,500 as compensation for his work on each of the 51 transactions, for a total of $127,500.

Many of the statements in the legal opinion letters and stock subscription agreements were in fact untrue. With respect to some of the stock issuances, Offill and Stocker devised a "pump and dump" scheme designed to artificially inflate stock prices and then sell the stock to the public for gain. In connection with each of these stock issuances, as well as other stock issuances, despite the representations in the subscription agreements that Offill had purchased the stock with investment intent, Offill in fact never paid for the stock. Moreover, he allowed Stocker to transfer the shares to co-conspirators within days of the initial issuance, for public sale thereafter. Under the "pump and dump" scheme, after Offill and Stocker distributed the stock to co-conspirators to create a secondary market, other conspirators, serving as "promoters," organized marketing campaigns to increase the value of the shares through spam e-mail, press releases, and faxes that contained false information about the issuing companies. The conspirators also manipulated the price of the shares by coordinating their trading activities to limit the supply of available stock. Once the stock reached a sufficiently high price, the conspirators "dumped" their shares by selling them to the public, providing the conspirators with a gain of millions of dollars. Some of the proceeds of these sales were deposited in brokerage accounts associated with Offill.

In Count I of the indictment, Offill was charged with participating in the illegal issuances of stock of nine companies: Emerging Holdings, Inc. (one issuance), MassClick, Inc. (one issuance); China Score, Inc. (one issuance); Ecogate, Inc. (one

issuance); Media International Concepts, Inc. (one issuance); Vanquish Productions, Inc. (one issuance); Custom Designed Compressor Systems, Inc. (one issuance); Auction Mills, Inc. (two issuances); and AVL Global, Inc. (two issuances). Count I also charged Offill with conspiracy to artificially manipulate the stock prices of Emerging Holdings, MassClick, and China Score. The remaining nine counts charged Offill with committing wire fraud in connection with his role in the stock issuance of Emerging Holdings.

Following trial, a jury found Offill guilty on all counts. The district court sentenced Offill to 60 months' imprisonment on the conspiracy count and to 96 months' imprisonment for each of the wire fraud counts, all to run concurrently. The court enhanced the sentences on the wire fraud counts under U.S.S.G. § 2B1.1 because the conspiracy had gained more than $1 million as a result of the illegal conduct. Although the resulting Sentencing Guidelines range provided for 168 to 210 months' imprisonment, the district court imposed a downward variance sentence of 96 months' imprisonment in order to avoid creating too great a disparity between Offill's sentence and the sentences of some co-conspirators, who had cooperated with the government.

This appeal followed.

II

Offill contends first that the district court abused its discretion in admitting the testimony of two expert witnesses presented by the government—Steve Thel, a professor of securities law at Fordham University, and Denise Crawford, the Commissioner of the Texas State Securities Board—arguing that their testimony included inadmissible legal conclusions and improperly addressed Offill's intent. Offill claims that the experts' testimony "wrested the obligation to instruct the jury from the trial court and told the jury how to decide this case."

Before trial, the government identified Thel and Crawford as experts on general securities law concepts and practice, including securities registration, exemptions from registration, restricted and unrestricted securities, and the functioning of markets. The government's notice to Offill about the anticipated testimony from these witnesses was detailed, outlining specifically each subject the government intended to cover with each witness. Offill filed a motion in limine (1) to "preclud[e] the government's expert witnesses from offering legal conclusions at trial and (2) to instruct any government expert that testifies that he or she may not discuss the legal consequence of Mr. Offill's alleged conduct or the conduct of his alleged co-conspirators." Ruling on Offill's motion, the district court stated that what the government had proposed to ask the witnesses would be admissible but, as Offill had requested, the court imposed limits on the proposed testimony. The court stated:

> In the response I think the Government has properly drawn the line in stating that they will not ask for any expert witnesses to give opinions as to conduct being illegal manipulation, or that a party has acted unlawfully, or that an entity or individual is liable, and will not ask any question which goes to the intent of Mr. Offill.

The court recognized that the government could present the witnesses' testimony by way of hypothetical questions

> to talk about the functioning of the securities markets, the ordinary practices and procedures, the rationale behind those policies and procedures and the regulations that apply. These hypotheticals can at times get a little close to the line if, obviously, tailored specifically to the conduct here.

Finally, the court pointed out that the line between proper and improper questions is not always clear and that counsel for Offill should preserve objections at trial, stating:

> Certainly, Mr. Brehm or Mr. Watson, if you believe you are listening to a hypothetical that is about to clearly require an answer that goes over the line, there is no restraint in my ruling from you making objections at any time you believe that line has been crossed.

During trial, Offill interposed no objection to the questioning of either Thel or Crawford. Had any of the questions been improper and had Offill objected, the court would have had the opportunity to regulate the testimony in light of the objection, directing the government to rephrase or avoid the objectionable question. For this reason, when no objection is made, we normally review objections raised for the first time on appeal under the plain error standard, set forth in Federal Rule of Criminal Procedure 52(b). *See United States v. McIver*, 470 F.3d 550, 561 (4th Cir. 2006).

Offill did, however, describe objections to potential questions in his motion in limine, which ordinarily would preserve for appeal the right to review clear and definitive rulings made by the district court on the motion. *See United States v. Lighty*, 616 F.3d 321, 353 n.36 (4th Cir. 2010). But in this case the court's rulings were general, and for that reason, the court invited Offill specifically to object during trial with respect to questions that Offill believed crossed the line.

In these ambiguous circumstances, the parties understandably dispute the appropriate standard of review to be applied. We need not, however, resolve the dispute because we reject each of Offill's assignments of error with respect to these expert witnesses' testimony.

Offill contends first that Professor Thel and Commissioner Crawford improperly gave opinions on the scope and meaning of specific legal terms and standards, including (1) the meaning of the term "underwriter"; (2) the criteria for securities registration; (3) the aspects of spam e-mail that would qualify

such e-mail as a "general announcement"; and (4) the criteria under TAC § 139.19 for when investors can sell shares. He argues that this testimony crossed the line drawn in *Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir. 1986), *abrogated on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988), for defining admissible testimony. In *Adalman*, the Court affirmed the district court's exclusion of an expert witness in a securities case, reflecting an understanding that when an expert's testimony directly concerns the ultimate issue in the case, the risk that the testimony will hinder the jury's deliberations is especially heightened. The court noted that even though "an expert may testify to an ultimate fact, and to the practices and usages of a trade, we think care must be taken lest, in the field of securities law, he be allowed to usurp the function of the judge." *Id.* at 368 (quoting *Marx & Co. v. Diner's Club, Inc.*, 550 F.2d 505, 512 (2d Cir. 1977)).

Federal Rule of Evidence 702 permits an expert to give opinions on scientific matters, technical matters, or matters involving other specialized knowledge so long as the testimony "*will assist the trier of fact* to understand the evidence or determine a fact in issue" (emphasis added). The touchstone of the rule is whether the testimony will assist the jury. Focusing on that criterion, we have held that it does not help the jury for an expert to give testimony that "states a legal standard or draws a legal conclusion by applying law to the facts," *McIver*, 470 F.3d at 562, because it "supplies the jury with no information other than the witness's view of how the verdict should read," *Weinstein's Federal Evidence* § 704.04[2][a] (2d ed. 2003). Determining when legal conclusions would be helpful to the jury must also take into account the role that the judge has in instructing the jury on the law. We have noted, for example, that when a witness gives an opinion about the meaning of a specialized legal term, the witness is giving a legal conclusion that is better handled by the judge and, coming from the witness, will be of little assistance to the jury.

Nonetheless, we have also noted that when the legal regime is complex and the judge determines that the witness' testimony would be helpful in explaining it to the jury, the testimony may be admitted. *See United States v. Barile*, 286 F.3d 749, 760 n.7 (4th Cir. 2002). Indeed, courts and commentators have consistently concluded that expert testimony that ordinarily might be excluded on the ground that it gives legal conclusions may nonetheless be admitted in cases that involve highly technical legal issues. *See, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts"); *Peckham v. Cont'l Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990) (expert testimony on proximate causation in insurance law was properly admitted because experts "could reasonably be expected to shed some light in a shadowy domain"); *Weinstein's Federal Evidence* § 704.04[2][a] (2d ed. 2003) ("[Expert] testimony may be helpful if the case involves a specialized industry").

We conclude that the specialized nature of the legal regimes involved in this case and the complex concepts involving securities registration, registration exemptions, and specific regulatory practices make it a typical case for allowing expert testimony that arguably states a legal conclusion in order to assist the jury. The jury in this case needed to understand not only federal securities registration requirements but also the operation of several obscure Texas Code provisions and their relationship with the federal regime. To be sure, the ultimate responsibility for instructing the jury on the law belonged to the district court, but we cannot conclude that in these circumstances the district court abused its discretion by concluding that the expert testimony presented in this case would assist the jury. Indeed, we find it difficult to imagine how the government could have presented its case against Offill without the assistance of expert testimony to explain the intricate regulatory landscape and how securities practitioners function within it.

Offill argues in addition that the testimony of Professor Thel and Commissioner Crawford invaded the province of the jury in suggesting Offill's liability. Our review, however, does not confirm that this occurred in any direct sense. *Cf. Barile*, 286 F.3d at 761-62 (excluding an expert's conclusion that specific § 510(k) submissions did not contain "materially misleading statements"); *United States v. Scop*, 846 F.2d 135, 138, 140 (2d Cir. 1988) (excluding expert testimony that an investment house had in fact conducted "manipulative and fraudulent scheme"); *Marx*, 550 F.2d 505 (excluding expert testimony as to the meaning of particular contractual terms at issue in the case and whether the party had complied with those terms). Instead, Professor Thel and Commissioner Crawford gave testimony on the general operation of securities law, even though the areas of testimony were directly relevant to the conduct with which Offill was charged, allowing the jury to determine the law's applicability to Offill. *See Bilzerian*, 926 F.2d at 1294-95 (expert testimony properly admissible where "testimony was general background on federal securities regulation and the filing requirements of Schedule 13D").

Finally, Offill contends that it was an abuse of discretion to allow the government to use hypothetical questions in obtaining Professor Thel and Commissioner Crawford's testimony on rebuttal. Specifically, Offill argues that Professor Thel and Commissioner Crawford gave opinion testimony addressing Offill's intent, in violation of Federal Rule of Evidence 704(b). That rule prohibits an expert witness from "testifying with respect to the mental state or condition of a defendant . . . as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged." The rule provides that such intent is an ultimate issue for the jury alone to decide. In particular, Offill objects to Professor Thel's testimony, given in rebuttal to Offill's testimony, when Professor Thel stated:

Q. What if the investor doesn't pay, but instead has a promissory note which he intends to pass on

> to the next person who he transfers or sells his stock to?
>
> A.  Well, I want to focus on the precise details. That would either be treated as nonetheless a sale, that paying with a promissory note is a sale. Like if I buy my car with a promissory note.
>
> If he had no intention of paying the promissory note, and this were a structure to get around the statute, I think the situation becomes worse. In the situation in which that first so-called purchaser isn't really buying it, what he is really doing is offering the security for sale to the second intermediary. And the person is an underwriter if they buy with a view to distribution or offer for the issuer in connection with the distribution.

Likewise, Offill objects to Commissioner Crawford's testimony, again given in rebuttal to Offill's testimony, when she stated:

> Q.  Could a Texas accredited investor rely on 139.14 to transfer the shares to another entity or individual for free so that other individual could sell those shares at a profit?
>
> A.  No. In fact, we would call that a scheme to evade the registration requirements if that were done.

Rather than addressing Offill's intent, however, both witnesses testified hypothetically. Professor Thel testified what the consequences would be if a purchaser were to buy stock in exchange for a promissory note, hypothesizing both an intent to repay the note and no intent to repay, and he con-

cluded that a transaction without intent to pay would not be a purchase or sale. Commissioner Crawford testified similarly about Texas law, concluding that under such a hypothetical scenario, there would be no sale. Rather, she stated, a sale without payment could be characterized as a "scheme to evade the registration requirements." In both cases, the jury was left with the open question of determining whether the hypothetical situations were applicable to Offill and, if so, in what respect.

It is well established that experts may offer opinions based on hypothetical questions proposed by the attorneys questioning them. *See* Fed. R. Evid. 703; *United States v. Mann*, 712 F.2d 941 (4th Cir. 1983) (per curiam). Such testimony would be admissible even though the hypothetical questioned mirrored the defendant's conduct, subject of course to the limitations that the witness not testify as to the defendant's "intent," as precluded by Rule 704(b). *See Bilzarian*, 926 F.2d at 1294; *United States v. Watson*, 171 F.3d 695, 703 (D.C. Cir. 1999). We conclude that the challenged testimony given by both witnesses in rebuttal in this case constituted appropriate opinion testimony.

In sum, we conclude that the district court did not abuse its discretion in its ruling on Offill's motion in limine and when regulating the testimony of Professor Thel and Commissioner Crawford during trial. Because the relevant legal regimes were complex, it assisted the jury to have them explained.

## III

Offill contends also that the district court abused its discretion in admitting lay opinion testimony from two co-conspirators, David Stocker and Mark Lindberg. He argues that many statements made by Stocker impermissibly included statements regarding the legal consequences of Stocker's conduct and, by implication, the legality of Offill's conduct. He refers in particular to statements in which Stocker

describes his own actions as "fraudulent," "securities manipulation," and "illegal." In a similar vein, Offill complains about Stocker and Lindberg's allegedly improper statements giving legal conclusions, including their understandings of the term "underwriter," of the requirements for securities registration, and of the transactions' compliance with those provisions. Inasmuch as Offill did not interpose objections to this opinion testimony either in his motion in limine or during trial, we review his arguments under the plain error standard. Whether we review under the plain error standard or harmless error standard, however, our conclusion is the same.

Federal Rule of Evidence 701 authorizes the admission of lay opinion testimony if it is: "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Rejecting the impractical notion that lay persons be required to testify only to pure facts when relating their knowledge of an incident, the rule allows testimony based on the person's reasoning and opinions about witnessed events, such as are familiar in every day life. Thus, on entering a room, a witness might say that she saw the victim on the floor with what looked like blood on his shirt, even though she was not an expert and had not tested the substance to confirm that it was blood. The important limitations are (1) that the opinion testimony be based on the witness' actual perception of events and (2) that it be helpful to the jury in understanding those events. Moreover, unlike the expert testimony rule, this rule permits lay testimony relating to a defendant's hypothetical mental state. *See United States v. Fowler*, 932 F.2d 306, 312 (4th Cir. 1991). Courts are, however, "mindful to guard against lay witness testimony when it involves 'meaningless assertions which amount to little more than choosing up sides.'" *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 110-

11 (4th Cir. 1991) (quoting Fed. R. Evid. 701, Advisory Committee Note).

Relevant to the question about whether Offill *intentionally* participated in the conspiracy, Stocker's testimony about the conspiracy's fraudulent nature and illegality would be helpful to the jury because it shed light, based on Stocker's personal knowledge of his own illegal conduct, on the nature and purpose of the conspiracy and Offill's interaction with Stocker in furthering its illegal aims. *Cf. Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 204 (4th Cir. 2000) (lay witness' testimony improper when not based on personal experience).

With respect to Offill's objection to statements by Stocker and Lindberg about their understandings of the term "underwriter," of the requirements of security registration provisions, and of the conspiracy's compliance with them, the testimony was similarly relevant to the nature and illegality of the conspiracy. Stocker and Lindberg testified to their understanding of various securities law requirements in describing their involvement in the conspiracy and their interactions with Offill. Stocker used the phrases "a scheme or plan to evade registration requirements" and "investment intent" when testifying about the content of actual conversations he had with Offill. Stocker similarly defined his understanding of "underwriter," which was particularly important to the jury's understanding of the conspiratorial conduct when Offill suggested to Stocker that he not give an opinion on whether Offill was an underwriter. Stocker stated that Offill had advised him to add legal phrases to the subscription agreement "in order to make the subscription agreement appear to comply with the law." Whether Stocker's definition of "underwriter" was a legally correct one was irrelevant inasmuch as his understanding of the definition was the basis for the conspirators' efforts at circumventing securities laws requirements.

At bottom, we conclude that the district court acted well within its broad discretion to admit this testimony under Rule 701.

## IV

Offill challenges two other rulings by the district court made during trial, neither of which merits extensive discussion. The court admitted subsequent acts evidence concerning Offill's involvement in a transaction that occurred in late 2006 and early 2007. This evidence, however, was admissible under Federal Rule of Evidence 404(b) and the four-part test that we articulated with respect to that rule in *United States v. Queen*, 132 F.3d 991 (4th Cir. 1997).

Offill also contends that the district court erred in failing to give the jury an instruction on multiple conspiracies. Again we have reviewed the record and find ample evidence to support the district court's decision to give only a single conspiracy instruction. But even if Offill were correct, the failure to give a multiple jury instruction would have been of no moment in this case where all of the evidence presented at trial related to Offill and not to any other conspiracy of which Offill was not alleged to be a part. As we have previously recognized, the danger of an improper single conspiracy instruction stems from the possibility that "the jury was likely to transfer evidence from one conspiracy to a defendant involved in an unrelated conspiracy." *United States v. Kennedy*, 32 F.3d 876, 883-84 & n.1 (4th Cir. 1994). But where, as here, a defendant is tried alone, there is no significant concern about spillover prejudice. *Id.* at 884.

## V

Finally, Offill challenges his sentence as unreasonable. He argues first that the district court clearly erred in not reducing his offense level for a minimal or minor role in the conspiracy. In determining whether such an adjustment is warranted,

a court looks to whether the defendant's conduct was "material or essential to committing the offense." *United States v. Blake*, 571 F.3d 331, 352-53 (4th Cir. 2009) (internal quotation marks omitted). In this case, the district court found that Offill's actions were clearly material and essential to the functioning of the conspiracy. Without his assistance in creating the documentation for the unregistered securities and in providing advice as to how to circumvent registration requirements, the other facets of the conspiracy could not have occurred. In addition, the evidence showed that Offill was intimately involved in the manipulation of sales to pump up the value of the unregistered securities before selling them to the public. These facts support the district court's refusal to reduce Offill's offense level for a minimal or minor role.

Offill next argues that his sentence was disproportionate in that it was longer than the sentences received by most of his co-conspirators. His co-conspirators, however, cooperated with the government or accepted responsibility for their actions, neither of which is the case with respect to Offill. Indeed, the district court found that Offill not only vigorously defended himself but did so with what the district court characterized as "one of the biggest pack of lies that I think I have ever heard from any defendant testifying in all my years of trial litigation." Nonetheless, Offill received a sentence that was 72 months below the bottom of the Sentencing Guidelines' recommended range. He has presented no evidence to suggest that this sentence was unreasonable, especially in light of the fact that we consider sentences within the Guidelines range to be presumptively reasonable. *See United States v. Johnson*, 445 F.3d 339, 341 (4th Cir. 2006).

Offill also contends that the district court failed to make specific findings as to the extent of his involvement in the conspiracy, as required by *United States v. Bolden*, 325 F.3d 471 (4th Cir. 2003). His argument, however, is belied by the record. In adopting the presentence report, the district court stated:

> I think that the Guidelines calculation [in the presentence report] is correct in every respect. The loss amount, as the government stated, is in excess of $1 million based on the facts and the testimony that I heard at trial . . . . And Mr. Offill was part and parcel to the use of fraudulent documents, many of which he is the one that created them, which enabled this scheme to move [forward] . . . . Again his role in the offense, although it is different and not as extensive as some of the members, especially the promoters perhaps, Mr. Stocker, he is clearly not a minimal minor participant, but a fully involved co-conspirator who participated for an extensive period of time in this unlawful conspiracy.

Finally Offill challenges the district court's calculation of the amount of financial gain imputable to him for purposes of determining the proper offense level under the Sentencing Guidelines. The Guidelines define the offense level for the crimes involved, based on the amount of gain *from the offense*. In this case, the district court was unable to determine accurately the loss to victims resulting from the conspiracy. Therefore, relying on U.S.S.G. § 2B1.1(b)(1) Application Note 3(B), the court used the "gain that resulted from the offense" as an alternative measure of loss and found it appropriate to use the amount of gain by the conspiracy, which was in excess of $1 million. This figure included both the payments directly received by Offill and the value of stock sales made by his co-conspirators to the public. Offill does not dispute the inclusion of gain actually received by him, but he does dispute the imputation of the gain realized by his co-conspirators. His position, however, overlooks several provisions of the Guidelines.

U.S.S.G. § 1B1.3(a)(b)(B) provides that a defendant involved in a joint criminal undertaking may be held responsible for relevant conduct that includes *all reasonably foreseeable* conduct of his co-conspirators that is in furtherance of

the conspiracy. Consistent with this section, courts have held that reasonably foreseeable losses attributable to the acts of co-conspirators may be included in the defendant's loss calculation under U.S.S.G. § 2B1.1. *See, e.g.*, *United States v. Robinson*, 603 F.3d 230 (3d Cir. 2010); *United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010); *United States v. Jenkins-Watts*, 574 F.3d 950 (8th Cir. 2009); *United States v. Catalfo*, 64 F.3d 1070 (7th Cir. 1995).

Moreover, Application Note 3(B) to U.S.S.G. § 2B1.1 states that a court "shall use the gain that resulted from *the offense*" (emphasis added). The use of the word "offense" when applied here refers to the *conspiracy*. Thus, Offill is imputed with the gain of the conspiracy, so long as that gain was "reasonably foreseeable" to him within the meaning of "reasonably foreseeable" in U.S.S.G. § 1B1.3.

Were we to limit the gain calculation in this case to the $127,500 that Offill received in fees, we would be grossly understating Offill's role in the conspiracy, which illegally acquired gains in the millions of dollars.

\* \* \*

For the foregoing reasons, we affirm Offill's conviction and sentence.

*AFFIRMED*