**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-4167**

UNITED STATES OF AMERICA,

               Plaintiff - Appellee,

     v.

CHARLES MICHAEL THOMSON,

               Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.    James K. Bredar, District Judge. (1:13-cr-00012-JKB-15)

Argued:  December 10, 2015        Decided:  January 27, 2016

Before TRAXLER, Chief Judge, and MOTZ and HARRIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Steven Hale Levin, LEVIN & CURLETT LLC, Baltimore, Maryland, for Appellant.  Andrea L. Smith, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF**: Sarah F. Lacey, LEVIN & CURLETT LLC, Baltimore, Maryland, for Appellant.  Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A jury convicted appellant Charles Michael Thomson of one count of conspiracy to distribute and possess with intent to distribute 100 kilograms or more but less than 1000 kilograms of marijuana, in violation of 21 U.S.C. § 846. He was sentenced to 37 months in prison. On appeal, Thomson contends that the district court erred in (1) denying his motions for judgment of acquittal, (2) issuing a willful blindness instruction, (3) admitting certain testimony from two cooperating coconspirators, and (4) issuing an Allen charge. We affirm.

I.

This case arises out of a marijuana trafficking organization headed by Kerem Dayi. Dayi operated the organization in conjunction with his internet retail business, Krush NYC, LLC ("Krush"), from a warehouse in Maryland. Dayi and his coconspirators obtained marijuana from California, arranged for its transport to Maryland, and distributed it in Maryland, New Jersey, and Ohio.

During the summer and fall of 2012, law enforcement officers in Nebraska and West Virginia stopped vehicles containing large amounts of either marijuana or cash.* In

---

* In May 2012, a Nebraska trooper stopped a pickup truck with Nevada tags being driven by Peter Rivera and seized approximately 100 pounds of marijuana. In September 2012, a
(Continued)

2

connection with the ensuing investigation, officers placed court-ordered wiretaps on telephones associated with Dayi and conducted surveillance of the Krush warehouse. During surveillance, Thomson was seen delivering two loads of marijuana, the first on November 16, 2012, and the second on December 11, 2012. On both occasions, Thomson was driving a pickup truck and pulling a three-axle trailer registered to him. Each delivery consisted of 16 boxes wrapped in black roofing paper and contained approximately 400 pounds of marijuana. Both deliveries occurred after dark.

On November 16, Thomson was met at the Krush warehouse by codefendant Jeremy Anderson from California. Anderson directed Thomson to the back of the warehouse, which was out of the sight of the surveillance officers. Approximately 30 minutes later, Thomson left the warehouse and drove in the far right lane at exactly 51 miles an hour to a Holiday Inn north of Philadelphia, Pennsylvania, where he stayed for several nights.

On December 11, Thomson drove directly to the back of the warehouse, but this time he could be seen by the surveillance officers. Thomson backed a Lexus vehicle out of the trailer,

West Virginia officer stopped an SUV with New Jersey tags being driven by Gabriel Gonzalez and seized a small amount of marijuana and four vacuum-sealed packages containing $121,600 in cash. Both men were linked to Dayi and the Krush warehouse.

and parked it on a lot behind the warehouse. Approximately 30 minutes later, Anderson joined Thomson in the trailer where they remained for over 15 minutes. Thomson did not assist in the unloading. He left shortly after others unloaded his truck. The following day, Thomson returned to the Krush warehouse and obtained a ride to the airport for a flight to his home in Minnesota. He left his truck and trailer at the warehouse, where they were later seized by law enforcement officers.

In January 2013, the grand jury returned an indictment against Dayi, Anderson, Thomson, and several others, for conspiracy to distribute and possess with the intent to distribute 1000 kilograms or more of marijuana, in violation of 21 U.S.C. § 846. Thomson and two of his codefendants - Gokahn Bergal and Anes Hadziefejzovi – were tried over a three-week period in the fall of 2013. Bergal and Hadziefejzovi were involved, among other things, in the receipt of Thomson's marijuana deliveries to the Krush warehouse, and they were convicted of the charged conspiracy offense. Thomson was convicted of the lesser-included offense of conspiracy to distribute and possess with intent to distribute 100 kilograms or more but less than 1000 kilograms of marijuana.

At trial, the government presented the testimony of three cooperating coconspirators - Kenny Eng, Robert Glickman, and

Neil Wylie – as well as that of over 20 law enforcement officers.

Eng was a childhood friend of Dayi. In 2011, Eng moved to California to obtain marijuana for Dayi and, in doing so, worked with Wylie, a marijuana middle-man. The marijuana was primarily sent to Dayi via the United States mail. On April 4, 2012, however, a Nebraska trooper stopped Eng's vehicle and seized a small amount of marijuana and approximately $230,000 in cash that Eng was transporting from New Jersey to California to pay Dayi's debt. Eng and Dayi, already suffering from a strained relationship, parted ways shortly thereafter. Among other concerns, Eng had become uncomfortable with Dayi's demands for larger and faster shipments of marijuana. As a result, Dayi began dealing more directly with Wylie.

Wylie ran an office and warehouse in Walnut Creek, California, not far from San Francisco, for the purpose of receiving, packaging, and shipping marijuana. During the first half of 2012, Wylie sent approximately 40 pounds of marijuana per month through the mail to Dayi. When Dayi began demanding larger marijuana shipments at a faster pace, however, Wylie enlisted the assistance of "Lewis" -- a commercial driver with an open car hauler. Lewis agreed to drive marijuana to Dayi on his scheduled trips. However, Lewis was required to make his legal deliveries along the way, stop at weigh stations, and

5

limit the amount of time he was driving -- all of which increased his delivery time and his risk. Lewis and Peter Rivera made a second trip using a private, commercial trailer that Dayi had advanced Lewis the money to buy so that he could "make faster times." J.A. 1582. Lewis also made a third trip. But, in the meantime, Dayi bought Rivera a truck because "Rivera was not going to go commercial" and, with the new truck, "he wouldn't have to stop at all the weigh stations." J.A. 1583. In May 2012, however, a Nebraska trooper seized approximately 100 pounds of marijuana from Rivera during a traffic stop and, shortly thereafter, Wylie reverted to mailing marijuana to Dayi.

Then, in the fall of 2012, Wylie made contact with Anderson, a former acquaintance who grew and distributed marijuana in California. Anderson was looking for a new client and he told Wylie that he "had . . . transportation already set up." J.A. 1595. More specifically, Anderson told Wylie that "he had a secure way that they had already been using for quite a while that he wanted to start putting his own product on instead of product for other people." J.A. 1598. Anderson also told Wylie that he "had a driver that . . . he had been using for years" and had "never had a problem." J.A. 1682. "He said it was a guaranteed way that they had used for a long time." J.A. 1601.

Anderson's driver turned out to be Thomson, whom Anderson had known since he was a teenager.  J.A. 1602.  Anderson's packing process involved putting 25 pounds of marijuana in a box, double shrink wrapping the box in plastic, putting the boxes into a bigger box, wrapping the bigger box with black roofing paper to mask the smell, and hiding the boxes in the secure storage space of Thomson's trailer, behind a vehicle that was transported as "cover" in the event Anderson was stopped by law enforcement along the way.  Anderson told Wylie that this wrapping method "had been tested by dogs before and . . . they couldn't smell it."  J.A. 1602.

Wylie was familiar with Thomson's trailer, and the person who custom-built it.  Anderson and one of Anderson's prior customers had assisted Thomson in locating and purchasing the trailer, which Thomson had specially designed to include the secure storage space.  Seeing an opportunity for all to profit, Wylie arranged for Anderson and Dayi to meet in California.  At this meeting, Anderson assured Dayi that his driver had already successfully defeated a drug-dog sniff during a traffic stop by using his wrapping method.

In November 2012, Wylie and Anderson met and packed the 16 boxes with marijuana, half of which were destined for Krush in Maryland and half for one of Anderson's customers in Philadelphia.  When Thomson arrived to pick up the loaded

7

trailer, Wylie was not initially present. Anderson had told Wylie that Thomson "kind of liked his privacy" and "didn't want to meet a bunch of people." J.A. 1618. Wylie only saw Thomson because he returned to the loading area to give Anderson the Krush address. Wylie did not recall seeing a vehicle in Thomson's trailer at the time, but Anderson had told Wylie that Thomson "planned to take a side trip to pick up a [classic] truck he was looking to purchase" because "he didn't like driving around with a[n] empty trailer all the time." J.A. 1697. Based upon his experience, Wylie testified that if Thomson were to get pulled over while hauling marijuana, having a vehicle in the car carrier "would make more sense than seeing an empty trailer." J.A. 1700. "It gives him options," J.A. 1698, Wylie testified, such as to claim that he was "going to a car show," J.A. 1700.

Wylie testified that Anderson told him that Thomson required Anderson to fly to Maryland to be present when Thomson made the delivery. Anderson explained to Wylie that Thomson "wouldn't drop off the marijuana to any random person without [Anderson] there. Because it is a drug deal and if he doesn't know the people, it would be risky just to show up and deliver something with someone you didn't know, could get robbed or who knows." J.A. 1686. After the delivery, Thomson returned to California carrying some of the proceeds. Anderson flew back to

8

California with the rest. Wylie testified it cost Dayi $40,000 to have the marijuana transported to Maryland and that, in his opinion, Thomson "knew he was transporting marijuana" because "you don't get paid $40,000 if you don't know." J.A. 1775; see also J.A. 1655 ("[Y]ou wouldn't get paid that if you weren't delivering something").

Thomson's December delivery consisted of another 400 pounds of marijuana that Wylie and Anderson had packed for shipment to Maryland and Philadelphia. Wylie was again not present when the boxes were loaded on Thomson's trailer, but he was advised that the shipment had arrived safely and that Dayi paid $40,000 for this trip. Wylie testified that the plan was for Anderson to drive Thomson's truck back to California with the proceeds because Thomson was going on a cruise with his family. However, the truck and trailer were seized before Anderson could do so.

According to Wylie, the price of the marijuana that was shipped from California to Maryland ranged from $2200 per pound to $3400 per pound. Thus the evidence overwhelmingly demonstrated, and Thomson did not contest, that he transported hundreds of pounds of marijuana worth hundreds of thousands of dollars, during each of his trips east.

Randy Glickman served as a mentor and advisor to Dayi in both his legitimate and illegitimate businesses. Glickman was present at the Krush warehouse when the November and December

9

deliveries were made and assisted in unloading the boxes from Thomson's trailer. Thomson, however, did not assist on either occasion. Glickman testified that the only time he saw Thomson was when Thomson came to the warehouse the day after the December delivery to get a ride to the airport. Glickman confirmed Wylie's testimony that the deliveries for Krush consisted of approximately 200-300 pounds of marijuana each, and that the remainder was destined for Philadelphia customers. Dayi told Glickman that he paid the driver $200 per pound, or about $50,000, for each delivery. Glickman testified that unless a common carrier such as UPS or FedEx were involved, they "did not ask someone to drive a load blindly, and not know what it was, because it's not the right thing to do," and that this was consistent with his advice to Dayi. J.A. 1208.

In his defense, Thomson testified that he was a legitimate, independent truck driver operating out of Minnesota (where he lived with his family) and Southern California (where he had previously resided). According to Thomson, he was already planning to commercially transport a car from Los Angeles, California, to Philadelphia, Pennsylvania, in November 2013, when Anderson called him and asked him "to stop by if he could throw some boxes on" Thomson's trailer, for delivery to Maryland. J.A. 2879. Thomson testified that Anderson always had some "harebrained scheme" going on, J.A. 2861, but he denied

10

knowing that the boxes contained marijuana. He testified that Anderson "had been chatting [him] up about this [eBay] business" and that Anderson had "all kinds of purses and shoes," but Thomson testified that he "really wasn't interested" because he "had [his] own problems." J.A. 2879.

According to Thomson, he agreed to pick up the boxes as a favor to Anderson, because Anderson had helped him find a trailer with secure storage space that he could purchase for approximately half-price, and because he was coincidentally planning to travel from San Diego to San Francisco to sell a "classic" truck at an auction there. According to Thomson:

> I pulled up and . . . [Anderson] greeted me and the normal stuff. And I said what's going on next door because there was a bunch of cars parked there. . . . There's an AA meeting going on. I said, oh, really, so I went across -- I said you know, hold on, get your boxes in there. I'm going to the AA meeting, I'm just going to sit in for a minute.

J.A. 2881. When he came back, the "[b]oxes were on, I believe there were four, I said put them away." J.A. 2882. Thomson testified that he then returned to San Diego to drop off the classic truck (that he had unsuccessfully tried to sell), drove back up to Los Angeles to pick up the car that he claimed he had been hired to transport to Philadelphia, and headed east.

When asked if he anticipated that Anderson would fly over to be at the Krush warehouse when he arrived, Thomson testified, "I told him he had to be there. . . [b]ecause . . . if I haul

11

for somebody else, I require them to be there." J.A. 2883. Thomson testified that:

> I don't know what he was spending to fly across the country. And I didn't know what kind of business he was involved in. That's his business. That's not my concern. My concern is what I was doing. So if he -- I don't, I mean, do you care about what other people do with their lives? I don't. They can do what they want. As long as it doesn't hurt me. So if [Anderson] was building a business, or whatever he was doing, and he was spending money, that's his business not mine.

J.A. 2979. Anderson was, in fact, at the Krush warehouse when Thomson arrived several days later. Thomson testified that he opened the door to the trailer for Anderson to unload the boxes, but again did not assist. He testified that Anderson paid him $250 for his trouble.

With regard to the vehicle that he transported along with the boxes, Thomson testified that he drove to Philadelphia and delivered the car to someone at a shopping mall. He could not recall the name of the person to whom he delivered the vehicle, but testified that it was a third person that the shipper had arranged for him to meet. Although Thomson testified that he had advertised his transportation services, he could not recall the publication in which he had advertised the trip. He also could not recall the exact amount of the payment that he received for the vehicle transport. Thomson testified that he

12

stayed four nights at a Holiday Inn near Philadelphia, looking for a load to take back, and then returned to California.

With regard to the December delivery, Thomson testified that Anderson hired him to haul a Lexus vehicle from San Francisco to Maryland, and again asked if he could "throw a couple boxes on because I was going to the same place." J.A. 2888. Thomson agreed, but again did not assist with the loading of the boxes or ask any questions about them. Thomson testified that Anderson was late meeting him in Maryland, and that he waited several hours at a rest area instead of going to the Krush warehouse. Thomson arrived at the warehouse after dark, but Anderson was still not there. Thomson unloaded the Lexus but not the boxes. Thomson testified that when Anderson arrived, they went into the trailer where he was "ripping" Anderson for making him wait. J.A. 2893. Thomson testified that he told Anderson to "lose my number, lose my name, don't call me again." J.A. 2893.

Thomson stayed at a hotel that evening, but returned to the Krush warehouse the following day to get a ride to the airport. Thomson gave several inconsistent statements regarding whether he attempted to arrange to transport a vehicle from Maryland to either California or Minnesota in the interim. But, in the end, he testified that his wife had arranged a flight home for him to Minnesota because they "had a month and a half or so to pack and

13

get out" of their foreclosed home. J.A. 2894. He testified that when he arrived at the Krush warehouse he "grabbed [a young kid] by the scuff of the neck," gave him twenty dollars, and "threw the keys [to his truck and trailer] to him." J.A. 2895. Thomson instructed the "kid" to give the keys to the owner of the Krush warehouse - whom Thomson testified he did not know - and to have this unknown owner give the keys to Anderson. Thomson testified that Anderson paid him $2500 of an agreed-upon $5000 for the second trip, but he did not wait to collect the second half of the payment. Thomson admitted that he went on a cruise with his family when he returned to Minnesota - prior to packing and vacating his foreclosed home - but claimed that his father-in-law paid for the trip.

Thomson had no DOT registration for his truck and trailer. Had he had such registration, applicable laws would have required him to stop at weigh stations and limited the amount of hours he could legally drive. Thomson testified that he mistakenly believed he did not need such a registration. Although Thomson claimed to perform his legitimate trucking business by internet listings and word of mouth, he had no business markings on his truck. When Thomson's truck and trailer were seized, law enforcement officers found no commercial driver logs, invoices, paperwork, or anything else

14

that would have indicated that Thomson was transporting goods in commerce for legitimate customers.

## II.

Thomson's first claim is that the government's evidence was insufficient to prove that he knowingly participated in the Krush marijuana-distribution conspiracy. We disagree.

We review the district court's denial of a Rule 29 motion for insufficiency of the evidence de novo. See United States v. Engle, 676 F.3d 405, 419 (4th Cir. 2012). "[W]e must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to support it." Id. "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of guilt beyond a reasonable doubt." Id. The defendant challenging the denial "must overcome a heavy burden, and reversal for insufficiency must be confined to cases where the prosecution's failure is clear." Id. (internal quotation marks and citations omitted). In evaluating the motion, we must also remain "mindful that the jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." United States v. McLean, 715 F.3d 129, 137 (4th Cir. 2013) (internal quotation marks omitted).

15

To obtain a drug trafficking conspiracy conviction under 21 U.S.C. § 846, "the government must prove that (1) the defendant entered into an agreement with one or more persons to engage in conduct that violated 21 U.S.C. § 841(a)(1); (2) that the defendant had knowledge of that conspiracy; and (3) that the defendant knowingly and voluntarily participated in the conspiracy." United States v. Howard, 773 F.3d 519, 525 (4th Cir. 2014) (alterations and internal quotation marks omitted). "Given the clandestine and covert nature of conspiracies, the government can prove the existence of a conspiracy by circumstantial evidence alone." Id. (internal quotation marks omitted); see also United States v. Burgos, 94 F.3d 849, 857 (4th Cir. 1996) (en banc). Once the conspiracy is proven, "the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." Burgos, 94 F.3d at 861 (internal quotation marks omitted). It is well established that "[t]he government can satisfy the knowledge requirement by showing either that [the defendant] actually knew of the conspiracy or that he was willfully blind to it by purposely closing his eyes to avoid knowing what was taking place around him." United States v. McIver, 470 F.3d 550, 563 (4th Cir. 2006) (internal alteration, quotation marks, and citation omitted).

Viewing the evidence in the light most favorable to the prosecution, we find ample support for the jury's finding that Thomson knowingly and voluntarily participated in the Krush conspiracy when he transported the two loads of marijuana from California to the Krush warehouse in Maryland.

The government presented overwhelming evidence of the existence of the Krush conspiracy, which had utilized "cover vehicles" to transport marijuana. The drivers were aware of the nature of their risky cargo and, in some cases, were provided financial assistance in obtaining their transport vehicles.

Anderson was a grower and supplier of marijuana in California whom both Wylie and Thomson had known for many years. The evidence established that Anderson assisted Thomson in obtaining a trailer at a significantly reduced price, and that the trailer was specially designed to include a secure storage or "dead space" in the front that government witnesses testified would facilitate the concealment of marijuana. Although Thomson claimed to be a legitimate commercial carrier, he did not register his vehicle for use as a commercial carrier, nor did he place any business logos on it. Thomson then used the truck and trailer to transport over thirty boxes that had been wrapped in dark plastic and secured in the specially designed storage area. Both loads included a vehicle that would have blocked view of the storage space and potentially legitimized the transport if

17

stopped by the police. Thomson required Anderson to travel across the country to meet him on the other side to take receipt of the boxes. He made both deliveries to the Krush warehouse after dark, waiting at a rest area for hours on the second trip instead of going straight to the warehouse, yet was absent during the times that his trailer was being unloaded.

Glickman testified that Dayi paid Thomson $200 a pound, or approximately $50,000, to drive each load of marijuana across the country. He also testified that it was his recommendation and experience that the drivers would be made aware that they were carrying marijuana because it would encourage the driver to exercise additional care and judgment during the trip. As Glickman noted, <u>not</u> knowing could cause more trouble than knowing because, for example, an unknowing driver might not be as careful to avoid being stopped by law enforcement. Wylie similarly testified that the prior drivers he had used on behalf of the Krush conspiracy knew what they were transporting, that Anderson told him that Thomson was paid $40,000 per load, and that Thomson must have known what he was transporting based upon the amount he was paid.

For his part, Thomson claimed that he did not know what was in the boxes, because it was "not [his] concern," J.A. 2979, and he "really wasn't interested," J.A. 2879. Thomson also claimed that he was only paid a total of $3000 for both trips. In other

18

words, Thomson claimed that Dayi, Wylie, and Anderson sent him off across the country on two separate occasions in possession of hundreds of pounds of marijuana worth hundreds of thousands of dollars -- and for which they had not yet been paid -- without telling Thomson.  However, there were ample bases upon which the jury could have concluded that Thomson was simply not being truthful about these matters - a determination that is solely within its province.  See McLean, 715 F.3d at 137; United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994).

Among other things that may not have rung true, Thomson claimed that he only made the first trip for Anderson to Maryland because he had already been hired to transport a vehicle to Philadelphia, and that he picked up the boxes because he was coincidentally planning to be in the San Francisco area to sell a "classic" truck.  However, Thomson related at best a vague memory of the circumstances surrounding the first vehicle transport.  He could not recall the name of the person who hired him, the publication from which he was hired, the make and model of the vehicle that he transported, the exact amount that he was paid for delivering the vehicle, or the shopping mall where he delivered the vehicle.  Thomson also testified that he delivered the vehicle to a third party based upon the word of the unnamed person who hired him.  Yet, Thomson acknowledged that he required Anderson to travel across the country to meet him at

19

the Krush warehouse because he did not want to deliver his load to someone he did not know.

Thomson also testified that, at the conclusion of his second trip, he left his truck and trailer at the Krush warehouse, threw the keys to his livelihood to some "kid" that he grabbed "by the scuff of the neck," with instructions that they be given to the "owner" of Krush for delivery to Anderson, and took a plane flight home to Minnesota instead. Thomson claimed that he was in a hurry to get home to pack up his foreclosed house and move back to California (for which he would need his truck and trailer), but he took a Christmas cruise with his family in the interim.

Viewed in the light most favorable to the government, the evidence was more than sufficient for the jury to conclude that Thomson was not being truthful and that Thomson did have actual knowledge that he was transporting marijuana from California to Maryland for the Krush conspiracy. The evidence was likewise sufficient, "at the very least," to establish that Thomson "purposely clos[ed] his eyes to avoid knowing what was taking place around him," and therefore "willfully blind to the unlawfulness of his actions." McIver, 470 F.3d at 563-64. "Either circumstance establishes Appellant's knowledge of the conspiracy." Id. at 564.

20

Thomson next contends that the district court abused its discretion by giving the jury the willful-blindness instruction.

"It is well established that where a defendant asserts that he did not have the requisite mens rea to meet the elements of the crime," as Thomson did in this case, "but evidence supports an inference of deliberate ignorance, a willful blindness instruction to the jury is appropriate." United States v. Ali, 735 F.3d 176, 187 (4th Cir. 2013) (internal quotation marks omitted). Although "caution must be exercised in giving a willful blindness instruction," id., the instruction is appropriate when "the evidence supports an inference that a defendant was subjectively aware of a high probability" that he was participating in criminal conduct and he "purposefully avoided learning the facts pointing to such liability." United States v. Jinwright, 683 F.3d 471, 479 (4th Cir. 2012) (internal quotation marks omitted). We review the district court's decision to give the willful-blindness instruction for abuse of discretion. Id. at 478.

Here, there was considerable evidence from which the jury could conclude that, even if Thomson had successfully avoided learning about the specific contents of the boxes thrown on his trailer, the warning signs were abundant and Thomson's claimed ignorance regarding the contents of the boxes was intentional or

deliberate. Thomson traveled from San Diego to the San Francisco area in order to allow Anderson - a person he described as being prone to "harebrained schemes" - to put 16 boxes wrapped in black plastic in the secure storage space on his trailer, which the jury could easily have inferred was inconsistent with any legitimate packaging of "purses and shoes" destined for a legitimate business. While Anderson was loading the boxes on the trailer for the first trip east, Thomson left the premises to attend an AA meeting. Thomson was also conspicuously absent when his unusually wrapped cargo was unloaded in Maryland, in both November and December. And while Thomson had no problem delivering the vehicle on the trailer to a third person at the request of the shipper, he required Anderson to travel across the country at additional expense just to meet Thomson at the Krush warehouse and unload the same boxes.

As the district court observed, Thomson's act of attending the AA meeting "sounds like the sort of conduct that a jury could conclude, not necessarily, but could conclude was in the nature of that averting of the eyes." J.A. 2919. So too was Thomson's notable absence on the other end of the delivery. Moreover, Thomson's testimony about Anderson's business affairs "bespoke an attitude or a perspective," J.A. 2920, that the jury could easily have viewed as "support[ing] an inference that

22

[Thomson] was subjectively aware of a high probability" that he was participating in criminal conduct and "purposefully avoided learning the facts pointing to such liability," Jinwright, 683 F.3d at 479. Accordingly, we discern no abuse of discretion on the part of the district court when it instructed the jury that it could find the requisite knowledge based on Thomson's willful blindness to the illegality of his actions.

IV.

Thomson's next claim is that the district court erred when it allowed into evidence certain testimony given by Glickman and Wylie. We review a district court's evidentiary rulings for abuse of discretion. See United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010). "The abuse of discretion standard is highly deferential, and a reviewing court should not reverse unless the ruling is 'manifestly erroneous.'" United States v. Graham, 711 F.3d 445, 453 (4th Cir. 2013).

A.

Federal Rule of Evidence 801(d)(2)(E) provides an exception to the hearsay rule for statements made by a defendant's "coconspirator during and in furtherance of the conspiracy." "In order to admit a statement under 801(d)(2)(E), the moving party must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in

23

furtherance, of the conspiracy." United States v. Pratt, 239 F.3d 640, 643 (4th Cir. 2001). "A statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." United States v. Shores, 33 F.3d 438, 443 (4th Cir. 1994). A statement may also "be in furtherance of the conspiracy even though it is susceptible of alternative interpretations and was not exclusively, or even primarily, made to further the conspiracy, so long as there is some reasonable basis for concluding that it was designed to further the conspiracy." Id. at 444. However, "[i]dle conversation that touches on, but does not further, the purposes of the conspiracy does not constitute a statement in furtherance of a conspiracy." Pratt, 239 F.3d at 643.

B.

Thomson contends the district court erred in admitting Glickman's testimony that Dayi told him Thomson was paid $200 per pound, or approximately $50,000 a load, to haul the marijuana from California to Maryland, because the statement was made during idle conversation after the fact and, therefore, not "in furtherance of the conspiracy." We are unpersuaded.

As the district court observed, Glickman served as a mentor and advisor to Dayi in both his legitimate and illegitimate business operations. Both Glickman and Wylie testified that

24

Dayi's demands for marijuana and for faster transport of the marijuana had been steadily increasing during 2012. This resulted in their pursuit of alternative means of transporting larger amounts of marijuana than had been possible through the mail. Clearly, Glickman's discussion with Dayi about the cost of transporting large quantities of marijuana for the Krush conspiracy, from California to Maryland by truck and trailer, was more than mere "idle chatter." See Graham, 711 F.3d at 454. Such statements are at the heart of any distribution business, and no less so for the conspiracy's business of distributing marijuana at a profit. Accordingly, the district court did not abuse its discretion in allowing Glickman's testimony.

We likewise reject Thomson's claim that the district court abused its discretion when it allowed Wylie to relate Anderson's statement that Thomson had successfully defeated a drug-dog sniff in the past using their wrapping method and that Thomson was paid $40,000 per trip for safely transporting the marijuana.

For the same reasons set forth above, Wylie's testimony about the cost of transporting the marijuana was admissible under Rule 801(d)(2)(E). Like Glickman, Wylie was intricately involved in the marijuana conspiracy, serving as a primary supplier on the California end. Anderson's claim that he and Thomson had a guaranteed means of safely transporting the marijuana for Dayi was likewise admissible under Rule

25

801(d)(2)(E). While the substance of Anderson's statement concerned Thomson's successful transportation activity in the past, the statement served to promote their method of transport to Wylie and Dayi and further their mutual goal of safely transporting the marijuana. The district court also did not abuse its discretion when it overruled Thomson's alternative objections to Anderson's statement under Rule 404(b) or Rule 403. As noted by the district court, the statement was not admitted as character evidence or to prove some other bad act or wrong on the part of Thomson. It was admitted as evidence of the ongoing activities and objectives of the conspiracy, the probative value of which clearly outweighed any possible prejudicial effect.

C.

Thomson next contends that the district court abused its discretion when it allowed Wylie to give opinion testimony, based upon his observations and experience, that "Thomson knew he was transporting marijuana" because "you don't get paid $40,000 if you don't know," J.A. 1775, and that Thomson's plan was to haul a classic car while transporting marijuana as cover in case he was stopped by the police. We disagree.

"Federal Rule of Evidence 701 authorizes the admission of lay opinion testimony if it is: '(a) rationally based on the perception of the witness, and (b) helpful to a clear

26

understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" United States v. Offill, 666 F.3d 168, 177 (4th Cir. 2011). "Rejecting the impractical notion that lay persons be required to testify only to pure facts when relating their knowledge of an incident, the rule allows testimony based on the person's reasoning and opinions about witnessed events, such as are familiar in every day life." Id. "[U]nlike the expert testimony rule, this rule permits lay testimony relating to a defendant's hypothetical mental state." Id.

As a major marijuana supplier to the Krush conspiracy, Wylie was intricately involved in efforts to find faster and safer transportation to satisfy Dayi's increasing demand. In this capacity, Wylie recruited at least two other drivers, both of whom were told that they were transporting marijuana and one of whom utilized a car carrier. Wylie was the person who put Dayi and Glickman in contact with Anderson and Thomson. And Wylie personally participated in the packaging and wrapping of the boxes that were placed in Thomson's trailer. Wylie's testimony that Thomson had to have known that he was transporting marijuana based upon the extraordinary amount he was being paid and that Thomson planned to use a cover vehicle to avert detection by law enforcement, even though expressed in

27

the form of opinions, fell well within the knowledge he possessed based upon his participation in the business of the conspiracy and his personal perceptions of the events that surrounded Thomson's trips. It was also, of course, clearly helpful to the jury's understanding of the conspiracy evidence that had been presented to it. Accordingly, the district court did not abuse its discretion in allowing the testimony.

V.

Thomson's final claim is that the district court improperly issued an <u>Allen</u> charge to the jury. "Derived from <u>Allen v. United States</u>, 164 U.S. 492 (1896), the commonly termed <u>Allen</u> charge is a supplemental instruction given by a trial court when the jury has reached an impasse in its deliberations and is unable to reach a consensus." <u>United States v. Cornell</u>, 780 F.3d 616, 625 (4th Cir. 2015). It advises the "jurors to have deference to each other's views, that they should listen, with a disposition to be convinced, to each other's argument." <u>United States v. Burgos</u>, 55 F.3d 933, 935-36 (4th Cir. 1995) (internal quotation marks omitted). "The crux of our <u>Allen</u> charge analysis is the likelihood of coercion. The district court acts within its discretion when the charge or charges, taken as a whole and in light of all the circumstances, do not coerce the jurors to abandon their view." <u>Cornell</u>, 780 F.3d at 626. And, of course, the district court "is in the best position to gauge

28

whether a jury is deadlocked or able to proceed further with its deliberations." <u>United States v. Seeright</u>, 978 F.2d 842, 850 (4th Cir. 1992); <u>see</u> <u>Renico v. Lett</u>, 559 U.S. 766, 774 (2010).

In this case, the jury, after three weeks of trial and ten hours of deliberation, sent a note to the district court which read as follows:  "What is the process, <u>or are there further instructions</u>, when the jury is deadlocked for one defendant, and there is no foreseeable resolution to the deadlock?"  J.A. 3490 (emphasis added).  There was no indication which of the three defendants was the subject of the deadlock or whether the deadlock involved the question of a particular defendant's knowing participation in the conspiracy or only the quantity of the marijuana involved.  Thomson and his co-defendants requested that the district court take a partial verdict for the two defendants and declare a mistrial for the third defendant.  The district court issued an <u>Allen</u> charge instead and returned the jury to further deliberations.  Approximately two hours later, the jury returned a unanimous verdict of guilty as to all three defendants.  Thomson's codefendants were convicted of the charged offense.  Thomson was convicted of a lesser-included offense based upon the drug quantity.

Thomson does not contest the content of the <u>Allen</u> charge. Rather, he contends that the district court's failure to advise the jury that a partial verdict could be returned under Federal

29

Rule of Criminal Procedure 31(b)(1), and/or its failure to immediately take a partial verdict, resulted in the Allen charge having an impermissibly coercive effect. We disagree.

As Thomson acknowledges, there is no specific requirement that the district court inform the jury of its ability to return a partial verdict. And we find no abuse of discretion in the district court's well-reasoned decision to issue an Allen charge rather than take a partial verdict as to the two defendants and declare a mistrial as to the third. The district court plainly took into consideration the length of the trial, the complexity of the conspiracy, and the relatively short period of time that the jurors had deliberated. Moreover, the jury did not request that they be allowed to return a partial verdict or even indicate that they were hopelessly deadlocked. They sought guidance as to their next step and, in doing so, specifically asked if "there [were] further instructions" to be considered. J.A. 3490. In such cases, "[w]e regularly uphold Allen instructions." Cornell, 780 F.3d at 627.

## VI.

For the foregoing reasons, we affirm Thomson's conviction.

AFFIRMED

30