PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

WILLIAM LEONARDO GRAHAM, a/k/a
Leo,

*Defendant-Appellant.*

No. 09-5067

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(1:08-cr-00411-WDQ-4)

Argued: January 31, 2013

Decided: March 29, 2013

Before TRAXLER, Chief Judge, and AGEE and DAVIS,
Circuit Judges.

Affirmed by published opinion. Judge Davis wrote the opinion, in which Chief Judge Traxler and Judge Agee joined.

## COUNSEL

**ARGUED:** Michael Alan Wein, Greenbelt, Maryland, for Appellant. Michael Clayton Hanlon, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for

Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

## OPINION

DAVIS, Circuit Judge:

A jury convicted Appellant William Leonardo Graham of one count of conspiracy to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846. Pursuant to 21 U.S.C. § 851, the district court imposed a mandatory life sentence. On appeal, Graham asserts reversible error in three respects: (1) an alleged violation of the Court Reporter Act, 28 U.S.C. § 753(b); (2) the admission of statements by coconspirators recorded during wiretapped conversations; and (3) his life sentence contravenes the Constitution. For the reasons set forth below, we reject each of Graham's contentions and we therefore affirm the judgment.

I.

Although several of Graham's codefendants testified against him and thereby provided direct evidence of his participation in the narcotics conspiracy, their trial testimony was significantly bolstered by recordings of their wiretapped conversations which occurred during the existence of the conspiracy. Graham's focus on appeal before us is that (1) the full vindication of his right to appellate review has been denied by the lack of a reliable trial record of the wiretapped conversations; and, in any event, (2) the district court abused its discretion when it admitted the wiretapped conversations. For the reasons explained within, we reject each of these contentions.

A.

On September 11, 2008, Graham was named with seven others in count one of a superseding indictment charging con-

spiracy to distribute and possess with intent to distribute five kilograms or more of cocaine from March 2006 through August 2008. Graham alone proceeded to trial; his codefendants entered into plea agreements or (as to one) the indictment was dismissed on motion of the government. Prior to trial, Graham's counsel discussed with the prosecuting Assistant United States Attorney ("AUSA") the admissibility of five recordings of wiretap conversations among Graham's codefendants in which Graham was not a participant. The government indicated that it planned to seek admission of the recordings as non-hearsay coconspirator statements and/or pursuant to the present sense impression exception to the hearsay rule.

Trial took place from August 17 through August 24, 2009. During opening statements, the AUSA explained to the jury that the government would present testimony of the case agent regarding the investigation, specifically as to how the government was able to install a wiretap on the cellphone of codefendant Lawrence Reeves, and thereby intercept conversations between Reeves and codefendants Devon Marshall and Justin Gallardo. The government further explained that the jury would hear in the recordings that Reeves, Marshall, and Gallardo were attempting to collect a drug debt from Graham. (Reeves, Marshall, and Gallardo all testified against Graham pursuant to plea agreements with the government.)

The government's first witness, Drug Enforcement Agency ("DEA") Special Agent Thomas Cindric, testified that investigators recorded approximately 35,000 conversations in the course of the investigation of the conspiracy. Cindric also confirmed that there were no recordings of Graham himself talking on the wire.

Next, Reeves testified. He explained how he and Gallardo were in a partnership: Gallardo received drugs from Arizona, Reeves distributed them to various buyers and sellers, and Gallardo returned the proceeds to the Arizona suppliers.

Reeves also described working with Graham to sell drugs, including going to Graham's house to "pick up the money that he owed [him] for [a] [ ] shipment of drugs that [he] gave him." J.A. 178. Reeves testified that he received a total of six shipments of cocaine from Arizona. At some point, Reeves met Marshall, one of Graham's customers. Reeves testified that Marshall was unhappy with Graham's prices and began to buy directly from Reeves.

Reeves testified that while working with Graham to sell the fourth shipment of narcotics, which was delivered to Graham's home and contained approximately 26 kilograms of cocaine and about 200 pounds of marijuana, they "gave [the drugs] to [Graham] up front and expected to get payment afterwards, after he was done selling." *Id.* at 191. Graham complained about the quality of the marijuana, however, and told them "he tried to sell" it but could not. *Id.* at 192. As a result, he owed Reeves and Gallardo money for the marijuana, which resulted in the Arizona suppliers going unpaid. According to Reeves, Graham's debt after that transaction was "about $30,000." *Id.*

Reeves further testified that Graham had received a portion of four of the six shipments from Arizona, but future supplies had ended "[b]ecause Leo [Graham] owed [them] on the money on the marijuana and he refused to pay. And therefore, [they] cut him off." J.A. 199. Specifically, Reeves explained that the sixth shipment was the last shipment from Arizona:

> There was a huge, basically, beef between myself, Mr. Gallardo, and the people in Arizona because of this marijuana, and because of the shortage, how those [kilos] came short, and the money not come in. So they basically shut us down.

J.A. 199.

Thereafter, Reeves asked Marshall to assist in persuading Graham to pay the debt. Reeves and Marshall planned to tell Graham that "Mexicans" were looking for him in hopes that he would be intimidated into paying the debt. *Id.* at 203. During Reeves's testimony, the government played three recordings[1] of wiretapped phone conversations on Reeves's phone. The jurors were given binders containing transcripts of each recording played during the trial. When a recording was played, the prosecutor referenced the corresponding tab number in the transcript binder for the jury to follow along.

Justin Gallardo was the second cooperating codefendant to testify. He testified that he transported cocaine from Arizona to Maryland, helped Reeves distribute it in Baltimore, and took the money earned from the sales to Arizona. Gallardo confirmed that Graham received multiple kilograms of each cocaine shipment the group received. He testified that he kept tally sheets, which were seized in August 2008 during the execution of a search warrant issued for his home. Gallardo used the sheets to keep track of the amount and type of drug each customer received and the money paid, and the portion of the money to be returned to Arizona. Gallardo's tally sheets showed that Graham acquired cocaine and marijuana from the group and that he owed or paid money for those drugs.

---

[1]Call number 1452 was played first, and it corresponded to "tab 8" in the binder. During call 1452, Reeves and "Big Moe" spoke about Moe's attempts to locate Graham. "Big Moe" was another associate, and he was offered a portion of the pay-out if he was successful in persuading Graham to pay the debt.

The second call played was call 23, which corresponded to "tab 13" in the binder. It consisted of Reeves talking with Gallardo about Marshall's attempts to get Graham to pay the debt. Reeves told Gallardo that Graham had refused to pay.

The third call played was call 1454, which corresponded to "tab 9" in the binder. The call was between Reeves and "Big Moe." Reeves explained Marshall's attempt to intimidate Graham by telling him "Esses" were looking for him, and that Graham continued to refuse to pay the debt.

Marshall was the third cooperating codefendant to testify. He explained that in early 2007 he began selling cocaine that he received from a supplier named "Leonardo." Marshall identified Graham as his supplier, "Leonardo." According to Marshall, he would pick up kilogram quantities of cocaine from Graham at Graham's home. Marshall stated that in October 2007 he began to obtain his supply directly from Reeves.

Marshall testified that Reeves informed him that Graham owed Reeves money,[2] and at Reeves's request, Marshall agreed to talk to Graham. When he did so, Marshall told Graham that Mexican cocaine suppliers were looking for him. In response, Marshall testified, Graham said he refused to give any money to Reeves until he "gets some more product" — "coke." J.A. 385.

After meeting with Graham, Marshall relayed the information to Reeves via telephone. Call 22, which was "tab 12" of the transcript binder, was played to the jury. In that call, Marshall told Reeves that Graham had refused to pay the debt. In this conversation, however, Marshall did not tell Reeves that Graham wanted more drugs, and Marshall explained during his testimony that this was because he (Marshall) did not like to talk about drugs over the phone. Marshall did indicate during the call, however, that Graham had said more, and that he (Marshall) would discuss it with Reeves the next day.

In its rebuttal closing argument, the government replayed the first twenty-three seconds of one of the conversations between Reeves and "Big Moe." *See supra* n.1.

The district court instructed the jury that the actual recorded conversations constituted the evidence, and not the

---

[2]Call 20, which corresponded to "tab 11" of the transcript binder, was played for the jury. In that call, Reeves asked Marshall to "pull it off" (i.e., get Graham to pay the debt), and told Marshall that he could "keep the rest" if he could manage to get the debt paid. J.A. 664.

transcripts, which were simply aids to follow the conversations.

The jury convicted Graham of conspiracy to distribute five kilograms or more of cocaine. The parties entered a stipulation that stated that the exhibits from the trial would be "retained by counsel who offered them, pending appeal." J.A. 503.

Graham was sentenced on November 6, 2009. During the sentencing proceeding, the government reminded the district court that it had filed an information under 21 U.S.C. § 851, "noting that the Defendant had three prior felony drug offenses." J.A. 515. The court asked whether there was a mandatory minimum sentence in the case, and the government confirmed that Graham faced a mandatory life sentence as a result of the § 851 information. In response, the court stated "[f]rankly, if I were applying 3553(a) factors, there is no way that I would impose that sentence in this case . . . . [I]t would be a severe sentence, but it would certainly not be a life sentence that I am required to impose in this case." J.A. 516. The court imposed a sentence of life imprisonment. Graham filed a timely notice of appeal.

B.

We appointed appellate counsel for Graham. During his research of appealable issues, counsel discovered that none of the recordings played during trial had themselves been recorded or transcribed by the court reporter during their presentation to the jury. Concerned that, as he had not been present for trial, his incomplete knowledge of the trial record might impede his representation of Graham before us, counsel filed and we granted a consent motion to rescind the briefing order to permit counsel to pursue relief before the district

court pursuant to Federal Rule of Appellate Procedure ("FRAP") 10.[3]

Thereafter, in summer 2011, the government provided to counsel a copy of a CD containing the recordings and a copy of the transcript binder. The district court held an evidentiary hearing to determine which recordings were played for the jury during trial. Prior to the hearing, the government submitted two affidavits to the district court. One was of the lead trial prosecutor, a former AUSA. The former AUSA stated that he, his co-counsel, and the case agent, had reviewed the DEA wiretaps in Graham's case, and selected which calls would be played at trial. He stated that he organized the preparation of the transcripts for the calls they planned to play for the jury, and checked the transcripts for errors prior to trial. He stated that, based on his recollection, as refreshed by his review of the trial transcript, the wiretap CD, and examination of the transcript binder, he could "attest that the compact disk provided to [him] by [the current AUSA] contains true and accurate copies of the wiretap recordings played during the trial in [Graham's] case." J.A. 710. He specifically identified which recorded calls from the duplicate CD had been played

[3]Federal Rule of Appellate Procedure 10(e) provides as follows in pertinent part:

(e) Correction or Modification of the Record.

(1) If any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly.

(2) If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded:

. . .

(B) by the district court before or after the record has been forwarded . . .

FRAP 10(e).

at each reference in the trial transcript to a tape being played to the jury.

During the hearing, the former AUSA testified consistently with the averments in his affidavit. He stated that he was in the courtroom when all of the recordings were played to the jury. He further testified that in preparation for the hearing, he reviewed each page of the trial transcript which indicated a recorded call had been played and "compar[ed] them to the transcripts and ma[de] sure that the transcripts were the transcripts that related to those calls." J.A. 729.

The second affidavit submitted prior to the hearing was of DEA Task Force Officer Detective William Nickoles. Nickoles stated that he was the case agent on Graham's case and, in that capacity, he reviewed wiretap recordings and the transcripts of the recordings selected to be used at trial. He asserted that he was present at trial when the calls were played on August 18, 2009, and when the prosecutor played a portion of a call during his rebuttal closing argument. Nickoles averred that he reviewed the contents of the CD that contained copies of the recordings prepared for trial, and the copy of the transcript binder prepared for the trial, and based on that review and his best recollection of relevant events, he could "attest that the compact disk provided to [him] by [the current AUSA] contains the true and accurate copies of the wiretap recordings played during the trial in [Graham's] case." J.A. 714.

Nickoles also testified at the hearing. He explained that, while working as the case agent on Graham's case, he had reviewed every wiretap call in the case. He also stated that he executed his affidavit after listening to the audio CD and reviewing the transcript binder provided to him, which together led him to conclude that they were accurate copies of the originals used in Graham's trial. Finally, he testified that the transcribed portions of the five phone calls in the five tabs

in the transcript binder were played in their entirety, and only the transcribed portions were played to the jury.

On July 25, 2012, the district court issued a Memorandum Opinion and Order Confirming Record on Appeal, which made findings as to which calls, and which portions of the calls, were heard by the jury. Six tapes were played at trial, covering five calls; one recording was replayed during the government's rebuttal argument. The district court "[found] beyond a reasonable doubt that the wiretap recordings played at trial were those indicated by the testimony and affidavits" presented by the government. J.A. 804. Thereafter, the parties resumed their briefing in this appeal.[4]

C.

Graham argues that the court reporter's failure to transcribe the contents of the wiretap conversations played to the jury during trial constituted a violation of the Court Reporter Act ("CRA"), 28 U.S.C. § 753(b), and that the district court lacked sufficient proof at the FRAP 10 hearing to conclude definitively what wiretap recordings were played to the jury. In response, the government argues that the district court's findings and conclusions are sound and that, even if the district court erred in failing to ensure at trial that the wiretap conversations played were recorded or transcribed contemporaneously by the court reporter, the error was resolved by the district court's FRAP 10 conclusions.

We review a district court's compliance with the CRA *de novo*. *United States v. Brown*, 202 F.3d 691, 696 (4th Cir. 2000).

The CRA states, in pertinent part:

---

[4]In our summary of the evidence set forth above in section I.A. of this opinion, we have interpreted the record fully in accordance with the district court's findings and conclusions.

> Each session of the court and every other proceeding designated by rule or order of the court or by one of the judges shall be recorded verbatim . . . . Proceedings to be recorded under this section include (1) all proceedings in criminal cases had in open court
> . . . .

28 U.S.C. § 753(b).

We have not previously addressed the issue whether a district court's failure to ensure the transcription of audio recordings played during a trial constitutes a violation of the CRA. We need not resolve the issue in this case, however, because Graham is not entitled to relief on his claim in any event. In *United States v. Brown*, we held that, although a defendant has a right to a meaningful appeal, with the assistance of a complete transcript, "omissions from a trial transcript only warrant a new trial if 'the missing portion of the transcript specifically prejudices [a defendant's] appeal.'" 202 F.3d 691, 696 (4th Cir. 2000) (quoting *United States v. Gillis*, 773 F.2d 549, 554 (4th Cir. 1985)). Thus, "'to obtain a new trial, whether or not appellate counsel is new, the defendant must show that the transcript errors specifically prejudiced his ability to perfect an appeal.'" *Brown*, 202 F.3d at 696 (quoting *United States v. Huggins*, 191 F.3d 532, 537 (4th Cir. 1999)). Because we find the district court's FRAP 10 findings were amply supported by the evidence presented at the hearing and enabled Graham to "perfect [his] appeal," we need not and do not address whether the CRA was violated. *Id.*

## D.

In reviewing the district court's decision on a FRAP 10 motion, we consider the district court's findings conclusive "unless intentionally false or plainly unreasonable." *United States v. Hernandez*, 227 F.3d 686, 695 (6th Cir. 2000) (citing *United States v. Zichettello*, 208 F.3d 72, 93 (2nd Cir. 2000); *United States v. Garcia*, 997 F.2d 1273, 1278 (9th Cir. 1993);

*United States v. Serrano*, 870 F.2d 1, 12 (1st Cir. 1989); *United States v. Mori*, 444 F.2d 240, 246 (5th Cir. 1971)).

Graham argues that the evidence presented at the FRAP 10 proceeding was insufficient to correct the lack of transcription of the recordings played to the jury. This is so, he contends conclusorily, because the trial court did not hear enough evidence at the FRAP 10 hearing to find definitively which recordings were played during the trial.

We disagree. The district court's findings were adequately supported by the evidence. First, the district court pointed to the fact that both of the witnesses were closely involved in the actual preparation of the original disc containing the recordings and transcript binder used at the trial. Both were present throughout the trial. The district court also noted that the lead trial prosecutor testified that he "very clearly" recalled which recording was played in his rebuttal closing, and after reviewing the trial transcript, the disc, and the transcript binder, remembered which of the other recordings had been played. J.A. 804-05. Lastly, the district court emphasized the fact that "Graham [who attended the hearing with counsel] presented no contradictory affidavits or testimony," and concluded that the calls that were played were calls 20, 22, 23, 1452 and 1454. *Id.* at 805-06.

Based on the wealth of highly persuasive evidence before the district court, we conclude the court had a sufficient basis to find beyond a reasonable doubt that the copies of the disc and transcript binder were genuine and accurate duplicates of the calls that were played at trial. We have no hesitation in concluding that Graham's counsel has available in this case an appellate record that fully and accurately reflects the pretrial and trial proceedings before the district court leading to the jury's verdict. *Cf. Hernandez*, 227 F.3d at 695.

## E.

Graham next argues that the district court erred in admitting the wiretap conversations of his coconspirators under Federal Rule of Evidence ("FRE" or "Rule") 801(d)(2)(E)[5] because the tapes merely captured "idle chatter" between them about Graham's past debt for marijuana, and because the conversations were not in the course, or in furtherance, of a conspiracy.

We review a district court's admission of a statement under Rule 801(d)(2)(E) for abuse of discretion. *United States v. Blevins*, 960 F.2d 1252, 1255 (4th Cir. 1992). The abuse of discretion standard is highly deferential, and a reviewing court should not reverse unless the ruling is "manifestly erroneous." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997) (quoting *Spring Co. v. Edgar*, 99 U.S. 645, 658 (1879)).

The standard for admission of a coconspirator statement is clear in this Circuit:

> A statement is not hearsay if it is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" and is offered against the party. Fed. R. Evid. 801(d)(2)(E). In order to admit a statement under 801(d)(2)(E), the moving

---

[5]Rule 801(d)(2)(E) provides:

(d) Statements That Are Not Hearsay. A statement that meets the following conditions is not hearsay:

(2) An Opposing Party's Statement. The statement is offered against an opposing party and:

(E) was made by the party's coconspirator during and in furtherance of the conspiracy.

The statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it under (E).

Fed. R. Evid. 801(d)(2)(E).

party must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy. *See*, *e.g.*, *United States v. Heater*, 63 F.3d 311, 324 (4th Cir. 1995). Idle conversation that touches on, but does not further, the purposes of the conspiracy does not constitute a statement in furtherance of a conspiracy under Rule 801(d)(2)(E). *See United States v. Urbanik*, 801 F.2d 692, 698 (4th Cir. 1986).

*United States v. Pratt*, 239 F.3d 640, 643 (4th Cir. 2001). "A statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." *United States v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994), *cert. denied*, 514 U.S. 1019 (1995).

The existence of the three prongs of admissibility for coconspirator statements (existence of a conspiracy, membership therein of defendant and declarants, and the statements being made in the course of and in furtherance of that conspiracy) must be supported by a preponderance of the evidence. *See Blevins*, 960 F.2d at 1255. The incorrect admission of a statement under the coconspirator statement exclusion from the definition of hearsay is subject to harmless error review. *United States v. Urbanik*, 801 F.2d 692, 698 (4th Cir. 1986).

Graham first contends that the district court erred by not making explicit findings on the existence of a conspiracy prior to admitting the statements. This argument fails, however, because a trial court is not required to hold a hearing to determine whether a conspiracy exists before admitting statements under the rule, and the court need not explain the reasoning behind the evidentiary ruling. *Blevins*, 960 F.2d at 1256. We "may affirm a judgment where the record reveals that the co-conspirator's statements were plainly admissible,

whether or not a detailed rationale for admitting the statements had been stated by the trial court." *Id.*

Next, Graham argues that each of the five recordings played for the jury was nothing more than "profanity laden conversation" about collecting a debt from Graham, but that "[t]here's no way that [conversations about] a 'debt collecting' job" constituted coconspirator statements. Appellant's Br. at 65-66 (brackets added). In other words, Graham contends that the conversations played for the jury were not "in furtherance of a conspiracy" to distribute cocaine.

The government responds that the only issue surrounding the admissibility of the statements is whether the conspiracy continued to exist on June 27, 2008, when the recordings were made. The government points to the efforts of Reeves and Marshall to collect the unpaid sums from Graham so that the money could be used to salvage the relationship with their Arizona-based supplier as indicative that the conspiracy was ongoing at the time of the calls. To the extent Graham is arguing that he withdrew from the conspiracy, the government adds, that claim must fail because it is the defendant who has the burden of establishing withdrawal, and "'[a] mere cessation of activity in furtherance of the conspiracy is insufficient.'" Gov't's Br. at 46-47 (quoting *United States v. Walker*, 796 F.2d 43, 49 (4th Cir. 1986)). The government contends that although Graham may have refused to pay the debt, he did not take affirmative action to withdraw from the conspiracy.

Additionally, the government argues the conversations were "in furtherance of the conspiracy," because "it was necessary for members of the conspiracy, Reeves and Marshall, to discuss the status of the conspiracy, the status of its members, and monies owed by one member to another." Gov't's Br. at 57.

The government's position is persuasive. The evidence demonstrates that one of the primary reasons Reeves and

Marshall sought to collect the debt from Graham was to gain funds to continue or re-establish their drug supply, which according to their testimony at trial, had been plentiful before Graham's refusal to ante up dislocated their profitable enterprise. Additionally, the evidence shows that Graham himself continued to want to engage in further drug activities with the group by receiving more cocaine. There is, in contrast, no evidence that Graham attempted to disavow the conspiracy and communicate his departure to his coconspirators. *See Smith v. United States*, 133 S. Ct. 714, 719 (2013) (holding that the burden rests with the defendant to establish withdrawal from a conspiracy). What we have said in the context of substantive liability for a conspiracy offense applies with equal force in the context of the admissibility of coconspirator statements: "evidence of an internal conflict between [a defendant] and other members of the conspiracy" is not alone sufficient to undermine proof that coconspirator statements were made in furtherance of and in the course of the conspiracy. *See United States v. Green*, 599 F.3d 360, 369 (4th Cir.), *cert. denied*, 131 S.Ct. 271 (2010).

Even though Graham himself was not captured in a conversation with a coconspirator in any of the 35,000 calls recorded during the investigation of this case, and even though there was adversity between Graham and his coconspirators, each call played at trial contained discussions that rendered them "in furtherance" of the overall conspiracy. The calls all consisted of the speakers exchanging information about the status of their efforts to collect the intra-conspiracy debt owed by Graham. Some included discussions of the plan to give Graham the impression (to intimidate him into paying) that "Esses" or "Mexicans" were looking for him to collect on the debt, and most ended with the speakers planning the next time they would discuss their efforts to persuade Graham to pay up. It is apparent that debt collection was a primary aim of the conspiracy at the time the calls were made, most likely because recoupment of the unpaid funds had some bearing on

the group's ability to receive additional narcotics from their Arizona source.

In short, the district court's admission of the challenged statements was neither erroneous nor, it necessarily follows, an abuse of discretion. *Blevins*, 960 F.2d at 1256.

## II.

Finally, invoking the strongly-worded sentiments expressed by the district court at sentencing to the effect that it would not choose to impose a life sentence if it had a choice in the matter,[6] Graham challenges his mandatory life sentence.[7] Although the argument is not made with great clarity, we understand his principal purpose to be that he wishes to preserve the issue in the event the Supreme Court should elect to reexamine its holding in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998).[8] In any event, we are bound by

---

[6]The district court stated:

> In this case, if I did have my discretion, I would impose a harsh sentence. It would be a sentence at the bottom of the guidelines. It would be a 30-year sentence, which I find would be appropriate and would meet the goals of 3553(a), because you certainly deserve, I believe, every day of the sentence within the guidelines, but, as I said, at the bottom of the guidelines. I impose, because I am required to, a sentence of life.

J.A. 528.

[7]The government's timely filing of a 21 U.S.C. § 851 information put Graham on notice of its intent to prove at sentencing three prior felony drug offense convictions, rendering Graham eligible for an enhanced sentence under 21 U.S.C. § 841.

[8]*See, e.g.*, *United States v. Mason*, 628 F.3d 123, 133-34 (4th Cir. 2010):

> Finally, Mason contends that the fact of his prior convictions needed to be proved to a jury beyond a reasonable doubt. Because that fact was not found by a jury beyond a reasonable

*Almendarez–Torres* unless and until the Supreme Court says otherwise. Accordingly, we reject the challenge to Graham's sentence.

## III.

For the reasons set forth, the judgment is

*AFFIRMED*.

---

doubt, he asserts, the use of the prior convictions to enhance his sentence violated his Sixth Amendment rights. Mason candidly acknowledges that this argument is presented for purposes of preserving the issue for the Supreme Court and that, under the present jurisprudence of *Almendarez–Torres v. United States*, 523 U.S. 224 (1998), such an argument cannot be sustained. We agree. Moreover, we note that since *Almendarez–Torres*, the Supreme Court has repeatedly affirmed the exception, as have we. *See Shepard v. United States*, 544 U.S. 13, 25–26 & n. 5 (2005); *Apprendi v. New Jersey*, 530 U.S. 466, 488–90 (2000); *United States v. Cheek*, 415 F.3d 349, 354 (4th Cir. 2005).