**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4565**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

DELMENA MARIA STERLING, a/k/a Nicky Sterling, a/k/a Nikki Sterling,

Defendant – Appellant.

**No. 15-4566**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

FABION STEWART, a/k/a Stewart,

Defendant – Appellant.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, III, Senior District Judge. (1:14-cr-00416-TSE-4; 1:14-cr-00416-TSE-1)

Argued: May 11, 2017                    Decided: July 10, 2017

Before WILKINSON, KING, and WYNN, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED**: Benjamin Joel Beaton, SIDLEY AUSTIN, LLP, Washington, D.C., for Appellants. Daniel Thomas McGraw, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF**: Geremy C. Kamens, Acting Federal Public Defender, Kevin R. Brehm, Assistant Federal Public Defender, Frances H. Pratt, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia; Virginia A. Seitz, Nicholas J. Giles, SIDLEY AUSTIN, LLP, Washington, D.C., for Appellant Fabion Stewart. Jonathan A. Simms, THE SIMMS FIRM, PLC, Fairfax, Virginia, for Appellant Delmena Sterling. Dana J. Boente, United States Attorney, Christopher Catizone, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Defendants Delmena Maria Sterling and Fabion Stewart appeal from their convictions — and Stewart appeals from his sentence — after a jury in the Eastern District of Virginia convicted them of various offenses arising from their participation in a Jamaican lottery scam. Sterling challenges the district court's instruction on willful blindness. She and Stewart jointly maintain that the court erred by admitting improper hearsay evidence, and Stewart separately contends that the court erred in admitting other crimes evidence against him. Stewart then challenges his sentence in three respects, maintaining that the court erred in applying sentencing enhancements for vulnerable victims, amount of loss, and use of a false identification. As explained below, we reject the defendants' contentions and affirm.

I.

A.

In December 2014, Sterling and Stewart were indicted by the grand jury in Alexandria, along with codefendants Paul Laing, Tessicar Jumpp, and Alphanso Downie. The indictment alleged, inter alia, that Sterling and Stewart — mother and son — were conspirators in the Jamaican lottery scam, which principally targeted elderly victims. The victims were induced to send money to Sterling, Stewart, and other conspirators in the United States as so-called "taxes and fees" to support claims for millions of dollars in lottery winnings. When Sterling and Stewart received the victims' money, they kept a portion thereof for themselves and laundered the balances to their coconspirators in

3

Jamaica, including Laing and Jumpp. The victims, of course, never received any lottery winnings. As relevant here, the indictment charged Sterling and Stewart with conspiracy to commit mail and wire fraud, in contravention of 18 U.S.C. § 1349, plus conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h). The indictment also charged Stewart with three substantive counts of mail fraud, in contravention of 18 U.S.C. § 1341, and two counts of wire fraud, in violation of 18 U.S.C. § 1343.

Shortly before trial, Stewart pleaded guilty — without a plea agreement — to conspiracy to launder monetary instruments. In agreeing to the statement of facts supporting his guilty plea, Stewart admitted that Laing had "posed as a representative of various lottery entities and real and fake U.S. government agencies." *See* J.A. 174.[1] Stewart also agreed that Laing had convinced several victims that they had won lottery prizes and that, to collect their winnings, they "would need to pay certain taxes or advance fees." *Id.* Stewart acknowledged that he received three packages from one of the victims — containing a total of $75,000 in currency — and that he had cashed checks from other victims totalling $10,000. According to the statement of facts, Stewart kept a portion of those funds and forwarded the balance to Laing in Jamaica.

During Stewart's plea hearing, the prosecution represented that, although Stewart did not "actually admit to the allegations in the indictment," the statement of facts was sufficient to support his guilty plea. *See* J.A. 98. In his colloquy with the court, Stewart

---

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

admitted that when he first began to transfer money to Jamaica, "it was to help out a situation," but that he later realized that the funds he had received were the proceeds of illegal activity. *Id.* at 132. Stewart also acknowledged that he wired some of those funds from victims to Laing in Jamaica. Stewart told the court that he was receiving money from individuals who were "in the same situation [he] was in." *Id.* at 144. Stewart denied knowing, however, that Sterling, Jumpp, and Downie were involved in the lottery scam's fraudulent activities. The court found that, pursuant to the colloquy and the statement of facts, a sufficient factual basis had been shown, and Stewart's guilty plea was accepted.

B.

Although Stewart had already pleaded guilty to conspiracy to launder monetary instruments, he proceeded to trial on the other six charges against him. Sterling and Stewart were tried together and jointly sought to exclude, as improper hearsay evidence, certain statements made by conspirator Maydeen Williams. Williams, like Sterling and Stewart, had received packages of money from victims and forwarded portions of those funds to coconspirators in Jamaica. Williams, in the challenged evidence, was expected to testify as follows: that she had confronted her half-sister, conspirator Jumpp, about receiving packages of cash from victims and forwarding funds to Jamaica; that Williams had threatened Jumpp about returning a package of money to one of the victims; that Jumpp had tried to persuade Williams to continue forwarding money to Jumpp; and that Jumpp had advised Williams that Sterling and Stewart were involved in the lottery scam. The district court ruled that it would allow Williams's testimony concerning her out-of-court discussions with Jumpp, conditioned on the prosecution showing that Jumpp, in those

5

discussions, was trying to convince Williams to continue her involvement in the conspiracy.

Separately, Stewart sought to exclude, as improper evidence of other crimes, his use of the identity of victim Charles Bennett to fraudulently obtain debit cards in late 2012 and early 2013. Stewart argued that the lottery scam ended in 2011 and that his debit card fraud activities with respect to Bennett materially differed from the lottery scam. The prosecution countered that the Bennett identity theft evidence was admissible because it showed that the lottery scam conspiracy continued beyond 2011, and also because Stewart's knowledge of Bennett's identity supported the proposition that Stewart knew about and was involved in the lottery scam. The district court ruled that the Bennett identity theft evidence was admissible, but advised that a limiting instruction would be given.

C.

On May 5, 2015, the trial of Sterling and Stewart began in Alexandria. The prosecution called multiple witnesses, including coconspirators Downie, Williams, and Vinton Hall. Several of the conspirators had some level of family relationship with Sterling, Stewart, and each other. For example, Jumpp is Stewart's former cousin-in-law. Downie is Sterling's uncle, while Hall is Sterling's ex-husband and Jumpp's uncle. Williams is Jumpp's half-sister. Laing has a child with a sister of Stewart's wife.[2]

---

[2] Williams and Hall were charged by information. Prior to Sterling and Stewart's trial, Downie, Williams, and Hall pleaded guilty to conspiracy to launder monetary instruments. Downie was sentenced to eighteen months in prison, and Williams and Hall were sentenced to two years of probation. When the trial was conducted, Laing and Jumpp

1.

The trial evidence reflected that, beginning in about March 2010, conspirators Laing and Jumpp operated from Jamaica the lottery scam that contacted potential elderly victims and informed them that they had won lottery prizes.[3] The victims were advised that, in order to collect their prizes, they needed to pay advance taxes and fees. The victims included not only Charles Bennett, age 85, of Massachusetts, but also Harry Wolf, 88, of Virginia; Geraldine Donnell, 81, of North Carolina; and William Littrell, 77, of Florida. Laing and Jumpp directed the victims of the lottery scam to send funds to fellow conspirators in the United States — including Sterling, Stewart, Downie, Williams, and Hall — by shipping and mailing cash and checks to them, and by using money transfer services. The conspirators who received funds in this country retained portions thereof and forwarded the balances to Laing, Jumpp, and others in Jamaica.

The lottery scam ensnared its victims by utilizing telephone, fax, and email communications. One of the victims, Bennett, was called by a person using the name "Stephanie Phelps," who purported to be from the Publisher's Clearing House Sweepstakes and advised Bennett that he had won a $10,500,000 prize.[4] Phelps instructed Bennett to

---

were fugitives in Jamaica. Laing was apprehended in September 2015 and pleaded guilty to a single offense. He was sentenced to 120 months in prison.

[3] The trial evidence is recited herein in the light most favorable to the prosecution, as the prevailing party. *See United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006).

[4] At trial, a voicemail recording was placed in evidence relating to a call from "Stephanie Phelps," and the voice was identified as that of conspirator Jumpp. The evidence also reflected that several other conspirators used pseudonyms to communicate

7

send money to a "receiver," Marcia Fuqua of Virginia, who was another elderly victim of the lottery scam. *See* J.A. 281. The conspirators tried to convince Bennett to send Fuqua $70,000 for lottery fees, and Bennett actually sent $40,000 to Fuqua. Phelps instructed Fuqua to send Bennett's money to other conspirators, who sent most of it on to Jamaica.[5]

The evidence established that the lottery scam occurred mainly in 2010 and 2011, but also continued into 2012 and probably until October 2014. Sterling, Stewart, and their coconspirators obtained at least $400,000 from elderly victims.

2.

a.

Stewart's role in the lottery scam was extensive. The prosecution introduced into evidence against him the statement of facts and the transcript of Stewart's guilty plea hearing, wherein he admitted to his participation in the conspiracy to launder monetary instruments. Laing and Jumpp identified Stewart as a "merchant agent" on documents sent to several victims, informing the victims that they should forward their payments to Stewart. *See, e.g.*, J.A. 1274. Western Union and other business records revealed that, from March 2010 through December 2011, Stewart received approximately $31,000 from victims, who included Fuqua, Wolf, and Donnell. In March and May 2010, Stewart also

---

with their victims. For example, Laing was known as "David O'Connor" and "John Beckford." Hall received packages as "Peter Pino," his deceased father-in-law.

[5] In about March 2011, Fuqua alerted the FBI to the lottery scam. She thereafter assisted the FBI in recording telephone calls between herself and conspirator Jumpp. During those calls, Jumpp — using the handle Stephanie Phelps — instructed Fuqua to deposit a check from Bennett and then send a money order to Hall.

received three packages of cash totalling about $70,000. In all, the trial evidence confirmed that Stewart received at least seven packages of cash and obtained money from at least ten of the victims. Between March 2010 and December 2011, Stewart sent approximately $68,000 to conspirators Jumpp, Laing, and others in Jamaica.

Stewart's former girlfriend, Jene Guevara, accepted packages of money and sent cash to Jamaica on his behalf.[6] Guevara recorded a phone conversation with Stewart in October 2014, during which Stewart acknowledged his involvement in the lottery scam. Stewart then said that, as of that time, he had only "slowed down." *See* J.A. 510. Despite Stewart's insistence that he was acting solely at the direction of Laing, Stewart also purchased a MagicJack phone device in 2010 that Jumpp later used to contact victims.[7] The evidence proved that Stewart opened two fraudulent debit cards in victim Bennett's name in 2012 and 2013. Stewart listed Jumpp's email address on the fraudulent application he used for one of those debit cards, and the application used Bennett's name, date of birth, and social security number.[8]

---

[6] The Western Union records in evidence reveal that, from about July 2010 through November 2011, Guevara received approximately $3,100 and sent approximately $6,300 to Jamaica. Guevara assisted the authorities and was not charged.

[7] A MagicJack phone device was described as a "matchbox size device that plugs into a computer" that "allows the user to place calls over the Internet to U.S. and Canadian numbers for free, from anywhere in the world." *See* J.A. 444.

[8] When the Bennett identity theft evidence was introduced, the trial court instructed the jury that the evidence could only be considered for the limited purpose of ascertaining Stewart's "knowledge and intent with respect to the offenses alleged in the indictment." *See* J.A. 476.

b.

Sterling's role in the lottery scam was not as extensive as that of Stewart. Only two packages containing cash were sent to Sterling, and Sterling did not personally sign for either package. Sterling received four wire transfers from victim Fuqua that she forwarded to Jumpp. Sterling exchanged two phone calls with Jumpp. From August through October 2010, Sterling received approximately $4,500 from Fuqua through Western Union and similar services. During that period, Sterling sent approximately $4,300 to Jumpp in Jamaica. Fuqua also received a fax from Sterling's home on September 1, 2010, purporting to be from Publisher's Clearing House. The document Sterling faxed to Fuqua showed a balance due from Fuqua, plus a history of Fuqua's payments to the conspirators.

c.

The involvement of Sterling and Stewart in the lottery scam was confirmed by the challenged evidence of conspirator Williams. Under that evidence, in November or December 2010, Jumpp successfully entangled Williams in the lottery scam by asking Williams to collect cash that Jumpp's victims would mail to Williams. At Jumpp's direction, Williams kept a small portion of the money for herself and forwarded the balance to Jumpp in Jamaica. Jumpp called Williams on a daily basis during Williams's participation in the lottery scam. Williams even flew to Jamaica on one occasion and delivered cash to Jumpp in person. Williams admitted using a Visa credit card that Jumpp had opened in Fuqua's name to make purchases on Jumpp's behalf, as well as to pay Williams's own bills.

Williams continued to receive packages of cash from victims until about February 2011. When Williams became "concerned about receiving the money," she told Jumpp she planned to return one of the recent packages to the sender. *See* J.A. 358. Faced with possible detection, Jumpp admitted to Williams her involvement in the lottery scam. According to Williams, Jumpp said "that [Jumpp's] cousin, [Stewart], that lives in New York, gave her Ms. Marcia Fuqua's information, and that's when she started calling her and scamming her for the money." *Id.* at 358-59. Jumpp also told Williams that Fuqua sent money to Sterling, Stewart, and Hall. After this conversation, Williams forwarded the remaining cash to Jumpp.

3.

On August 8, 2013, the FBI and postal authorities arrested Stewart at a New York airport as he was entering the United States from Jamaica. Upon being interviewed, Stewart executed a written statement. He explained therein that Laing got Stewart involved in the lottery scam, having advised Stewart that he had won $2.5 million from the Publisher's Clearing House Sweepstakes, but that he would need to remit the taxes and fees to claim his lottery prize. Stewart responded by sending Laing money until Stewart's grandmother told Stewart not to trust Laing. Nonetheless, Stewart agreed to help Laing by accepting packages of cash from strangers in order to pay his taxes and fees and thus claim his lottery prize. Stewart initially said he had received two packages of cash from Virginia, but later admitted that he had received a third package of cash and had "deliberately shorted" the officers on the number of packages he had received. *See* J.A. 575.

11

D.

After the prosecution rested, Stewart moved for judgments of acquittal on the six conspiracy and fraud charges being tried against him. He contended that the evidence was insufficient — particularly on the intent to defraud element — as to each charge. Meanwhile, Sterling moved for judgments of acquittal on the two conspiracy charges against her, arguing that the prosecution had failed to prove that she knew the aims of the conspiracies and had entered into them. The court denied the motions of both Sterling and Stewart.

In defending themselves, Sterling and Stewart recalled to the stand as their sole witness an FBI agent involved in the investigation. At the charge conference, Sterling and Stewart objected to the proposed instruction on willful blindness, but that objection was overruled. After deliberations, the jury found Sterling guilty of the two conspiracy offenses, and it found Stewart guilty of the six conspiracy and fraud offenses.

E.

The district court sentenced Sterling to twelve months plus a day in prison, and Stewart to sixty months. Stewart's presentence report ("PSR") calculated a total offense level of 36. With a criminal history category of I, Stewart's advisory Sentencing Guidelines range was 188 to 235 months in prison. The PSR recommended a two-level enhancement for the vulnerability of the victims, stemming from their ages. Stewart contended that, under the evidence, he had only received packages from Fuqua and was never aware of her age. Stewart also argued that the fact that he knew Bennett's age when he obtained debit cards in 2012 and 2013 did not prove that he had known Bennett's age

12

earlier. The court overruled Stewart's objection to the vulnerable victim enhancement, finding that "the evidence does preponderate in favor of showing that Mr. Stewart knew that at least some of these victims were elderly, certainly Bennett and Fuqua, and were targeted because of their age." *See* J.A. 1315.

Next, the PSR calculated the applicable amount of loss as more than $406,000, based on the trial evidence, resulting in a fourteen-level enhancement. Stewart argued that the amount of loss should instead be $244,000, which would only support a twelve-level enhancement. Stewart maintained that Bennett's losses of $70,000 should not be attributed to Stewart because he did not receive those funds. He also argued that Bennett's losses were not reasonably foreseeable in that he sent his money to another victim (Fuqua), rather than to a conspirator. The district court withheld ruling on Stewart's objection to the PSR's calculation of the amount of loss.

Finally, the PSR recommended a two-level enhancement for using a false identification because the evidence showed that Stewart had used Bennett's personal information to obtain debit cards in Bennett's name. Stewart contended that this enhancement did not apply because his use of Bennett's personal information, even if true, was not relevant conduct. According to Stewart, the offense conduct involved the lottery scam only, and his fraudulent use of Bennett's name to obtain debit cards occurred well after the lottery scam ended. The district court overruled that objection, finding that Stewart's conduct was "part and parcel of the overall conspiracy." *See* J.A. 1308.

The district court then adopted the PSR — withholding a decision on the amount of loss — and calculated Stewart's advisory Guidelines range as 135 to 168 months. After

13

argument, the court adopted the PSR's loss calculation, but explained that "[t]hose two levels make no difference at all to the sentencing decision." *See* J.A. 1326. The court then varied downward from the advisory Guidelines range, sentencing Stewart to sixty months on each of his convictions, to run concurrently. The court also imposed a restitution and forfeiture award of more than $406,000. The court reiterated, with regard to the amount of loss, that it "didn't make a lot of difference to me whether it was a 12- or 14-point enhancement, although I think the calculation of . . . over 400,000 is correct on the evidence before the court." *Id.* at 1332. The court further explained that it would impose the same sentence notwithstanding "most of the objections that [Stewart] raised," because sixty months "is an appropriate sentence." *Id.* at 1332-33.

Sterling and Stewart each timely noted an appeal. Sterling's appeal is designated as No. 15-4565, and Stewart's appeal is No. 15-4566. The appeals were consolidated for briefing and argument, and we possess jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II.

We first assess Sterling's appeal. She presents two contentions: that the district court erred by admitting prejudicial hearsay statements, and that the court erred in instructing the jury on willful blindness.

## A.

Sterling first contends that the district court erred in allowing conspirator Williams to testify to out-of-court statements of conspirator Jumpp that implicated Sterling and

14

Stewart in the lottery scam. We review a trial court's evidentiary rulings for abuse of discretion. *See United States v. Faulls*, 821 F.3d 502, 508 (4th Cir. 2016). A reversal is only warranted if, upon consideration of the facts and applicable legal principles, the court's ruling "was arbitrary or irrational." *Id.* (internal quotation marks omitted).

Although Sterling characterizes the challenged evidence as hearsay, an out-of-court statement is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy." *See* Fed. R. Evid. 801(d)(2)(E). As we have explained, "[a] statement by a coconspirator is made in furtherance of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." *See United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013) (internal quotation marks omitted). The trial court allowed Williams's testimony as involving statements of a coconspirator (Jumpp) in furtherance of the conspiracy. By her testimony, Williams — suspecting that Jumpp had not been honest about the origins of the funds Williams had been receiving — threatened to "send the package back to the sender" if Jumpp did not explain the source of the funds. *See* J.A. 358. Jumpp then admitted that Stewart had provided Fuqua's information, which enabled Jumpp to contact and scam Fuqua. Jumpp also admitted that Fuqua had sent money to Sterling and Stewart.

Put simply, Jumpp's statements to Williams were made in furtherance of the lottery scam conspiracy, in that they furthered the conspiracy by convincing Williams not to return money to the victims. Jumpp's statements also persuaded Williams to continue to launder various sums of cash in furtherance of the conspiracy. In these circumstances, the trial

15

court did not abuse its discretion by allowing Williams to testify to her discussions with Jumpp.

## B.

Next, Sterling contends that the district court erred in instructing the jury on willful blindness, arguing that there is no evidence that she "purposely and consciously avoided learning the details of the scheme." *See* Br. of Appellants 30. We review for abuse of discretion a trial court's decision with respect to a jury instruction. *See United States v. Bartko*, 728 F.3d 327, 343 (4th Cir. 2013).

As we recently explained, a willful blindness instruction may be appropriately given when "the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." *See United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017) (internal citations omitted). If the trial evidence "supports both actual knowledge on the part of the defendant and deliberate ignorance, a willful blindness instruction is proper." *Id.* At trial, Sterling argued that her lack of knowledge of the conspiracy was a well-founded defense to the charges. For example, during closing argument, Sterling's defense counsel contended that Stewart — not Sterling — had sent a fax to Fuqua from Sterling's house. The lawyer emphasized that Sterling had never signed for any of the packages of cash that came to her house. Nevertheless, the evidence proved that Sterling had received large sums of cash and wire transfers of funds from persons she did not even know and then had transferred most of those funds to Jumpp in Jamaica. Moreover, a person using Sterling's fax machine had sent a document furthering the lottery scam to Fuqua in the middle of the night. Such warning signs can readily justify a trial

16

court's decision to give a willful blindness instruction. *Cf. United States v. Ali*, 735 F.3d 176, 188 (4th Cir. 2013) (providing examples of warning signs); *United States v. Ruhe*, 191 F.3d 376, 385 (4th Cir. 1999) (same). In these circumstances, the court did not abuse its discretion in instructing the jury on willful blindness.

## III.

We turn to Stewart's appeal. In addition to contending that the district court erred by admitting prejudicial hearsay statements — a contention we have already rejected — Stewart asserts that the court erred in admitting other crimes evidence concerning his theft of victim Bennett's identity. Stewart also contends that the court erroneously applied three sentencing enhancements, that is, for vulnerable victims, amount of loss, and use of a false identification.

## A.

Stewart argues that the district court erred in admitting evidence that he had used Bennett's identity to fraudulently obtain two debit cards, in that those events occurred after and entirely separate from the lottery scam. The Bennett identity theft evidence, Stewart asserts, should have been excluded as inadmissible other crimes evidence. Again, we review for abuse of discretion the evidentiary rulings of a trial court. *See United States v. Faulls*, 821 F.3d 502, 508 (4th Cir. 2016).

### 1.

Rule 404(b) of the Federal Rules of Evidence excludes "[e]vidence of a crime, wrong, or other act" that is offered "to prove a person's character in order to show that on

17

a particular occasion the person acted in accordance with the character." Rule 404(b), however, "applies only to limits on the admission of other acts extrinsic to the one charged." *See United States v. Lipford*, 203 F.3d 259, 268 (4th Cir. 2000) (internal quotation marks omitted).

Other bad acts are intrinsic — as opposed to extrinsic — when those acts "are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *See Lipford*, 203 F.3d at 268. Intrinsic evidence, as we have explained, arises "out of the same . . . series of transactions as the charged offense, . . . or . . . is necessary to complete the story of the crime (on) trial." *See United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994) (alterations in original) (internal quotation marks omitted). Furthermore, other bad acts may be intrinsic even though the acts occurred outside the alleged time frame of the crime. *See id.* ("It is well-established . . . that the mere fact that the evidence involved activities occurring before the charged time frame of the conspiracy does not automatically transform that evidence into 'other crimes' evidence.").

Here, the trial court admitted — over Stewart's objection — the evidence that Stewart used Bennett's personal information in 2012 and 2013 to falsely pose as Bennett and open two debit card accounts. Stewart obtained access to Bennett's personal information because Bennett was a victim of the lottery scam in about November 2010.

Stewart's argument under Rule 404(b) for exclusion of the Bennett identity theft evidence fails because that evidence is intrinsic — rather than extrinsic — and is thus not subject to the limitations of Rule 404(b). The indictment alleged that the lottery scam

18

began "in or about March 2010" and continued "through at least in or about 2011." *See* J.A. 30. Stewart argues that the Bennett identity theft — which occurred in 2012 and 2013 — is thus outside the time frame of the lottery scam. Stewart's theory fails, however, for several reasons.

First, as we have recognized, "ending dates on indictments are often tentative and subject to change as more information is revealed during the course of legal proceedings." *See United States v. Bakker*, 925 F.2d 728, 739 (4th Cir. 1991). In any event, Stewart's indictment did not allege that the lottery scam ended in 2011; rather, it alleged that the scam continued "through at least" that year. *See* J.A. 30. Moreover, Stewart's contention that the Bennett identity theft occurred entirely after the lottery scam ended is belied by the trial evidence. Guevara confirmed, for example, that in a phone call of October 2014, Stewart acknowledged his ongoing involvement in the lottery scam. Notably, Stewart admitted that, as of that date, he had only "slowed down" his participation in the scam. *Id.* at 510. By then, the Bennett identity theft had already occurred.

At bottom, the Bennett identity theft was inextricably intertwined with the lottery scam. *See Lipford*, 203 F.3d at 268 (explaining that evidence is intrinsic when acts are "inextricably intertwined" or "part of a single criminal episode"). Stewart and his coconspirators obtained information and funds from Bennett in furtherance of the lottery scam, and Stewart used that same information to steal Bennett's identity. The Bennett identity theft evidence was therefore properly admitted against Stewart.

19

2.

Even if otherwise admissible, relevant evidence may be excluded by a trial court pursuant to Federal Rule of Evidence 403. Before excluding relevant evidence, however, the trial court is obliged to weigh the probative value of the evidence against the dangers identified in that rule:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

*See* Fed. R. Evid. 403. Here, the district court ruled that the Bennett identity theft evidence was "not unfairly prejudicial under [Rule] 403." *See* J.A. 226. According to Stewart, however, the Bennett identify theft evidence was riddled with the dangers outlined in Rule 403. Stewart claims that the evidence was "wholly cumulative of other direct evidence" and was only offered to show he "had a penchant for fraud." *See* Br. of Appellants 20. Although Stewart raises potential red flags with respect to the Bennett identity theft evidence, he fails to show how those dangers substantially outweigh the probative value of that evidence. We are satisfied that, in these circumstances, the court properly weighed the probative value of the Bennett identity theft evidence against the dangers enumerated in Rule 403.

B.

Stewart also interposes challenges to three sentencing enhancements. In reviewing the propriety of such enhancements, "[w]e accord due deference to a district court's application of the [Sentencing Guidelines]." *See United States v. Steffen*, 741 F.3d 411,

20

414 (4th Cir. 2013). We assess the court's factual determinations for clear error. *Id.* If "the issue turns primarily on the legal interpretation of a guideline term," however, "the standard moves closer to de novo review." *Id.* (alterations and internal quotation marks omitted). We review a sentencing court's loss calculation for clear error. *See United States v. Jones*, 716 F.3d 851, 859-60 (4th Cir. 2013).

1.

In his first sentencing challenge, Stewart argues that the district court erroneously applied a two-level enhancement for vulnerable victims under section 3A1.1(b)(1) of the Guidelines. A vulnerable victim is someone "who is a victim of the offense of conviction and any [relevant] conduct for which the defendant is accountable" and "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *See* USSG § 3A1.1(b)(1), cmt. n.2 (2014). For the enhancement to apply, the sentencing court is obliged "to determine whether [the] particular victim was more vulnerable to the offense than the world of possible victims. Then, the court must determine whether the defendant specifically targeted the victim because of that vulnerability." *See United States v. Singh*, 54 F.3d 1182, 1192 (4th Cir. 1995).

The trial evidence was that the victims of the lottery scam were targeted because they were elderly. Stewart opened two debit card accounts using the name and date of birth of the 85-year-old Bennett. Jumpp obtained the personal information of Fuqua — who was in her eighties — from Stewart. Jumpp later used Fuqua's date of birth to open a debit card account in her name, creating an inference that Stewart had given that information to

21

Jumpp. Quite clearly, the conspirators knew of the vulnerable ages of their several victims. Thus, the court was entitled to infer that the victims were targeted due to their age-related vulnerability. In these circumstances, the district court did not err in applying the two-level vulnerable victim enhancement.

2.

Next, Stewart contends that the district court erred in attributing more than $400,000 in losses to him, including Bennett's $70,000 loss, and thereby applying a fourteen-level enhancement under section 2B1.1(b)(1)(H) of the Guidelines. Stewart argued at sentencing, instead, for a twelve-level enhancement. The controlling question is whether Bennett's $70,000 loss was properly includable as relevant conduct, i.e., whether it was "reasonably foreseeable" to Stewart. *See* USSG § 1B1.3(a)(1)(B) (defining relevant conduct).

Bennett was not shown to have sent money to Stewart as part of the lottery scam. Stewart thus argues that Bennett's $70,000 loss was not foreseeable by him. Under the evidence, however, the loss was entirely foreseeable to Stewart, in that he and Jumpp were conspiring to defraud Bennett. We are satisfied that Bennett's $70,000 loss was reasonably foreseeable to Stewart, and the sentencing court therefore did not clearly err in calculating the amount of loss attributable to him.[9]

---

[9] Although the district court ruled that the amount of loss would not make a difference to its sentencing decision, it did make a difference in the court's restitution and forfeiture award, which Stewart also challenges on appeal. Indeed, the court observed that if Stewart prevailed on appeal as to his amount of loss contention, "then on remand, I would enter a different order of forfeiture." *See* J.A. 1338. Because we conclude that the court

22

3.

Finally, Stewart challenges the district court's two-level enhancement under section 2B1.1(b)(11)(C)(i) of the Guidelines for his fraudulent use of Bennett's identity to obtain the two debit cards. In sentencing Stewart, the court concluded that his participation in the Bennett identity theft was "relevant conduct" under section 1B1.3(a). The court therefore applied a two-level enhancement for "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." *See* USSG § 2B1.1(b)(11)(C)(i).

Stewart takes umbrage with the characterization of the Bennett identify theft evidence as relevant conduct for sentencing purposes. He argues that, although the lottery scam and the Bennett identify theft had the same victim (i.e., Bennett), the usage of Bennett's identity to obtain the debit cards was independent of the lottery scam. Thus, according to Stewart, the Bennett identity theft evidence was not "relevant conduct" with respect to the lottery scam, and the two-level enhancement was not applicable.

Under the Guidelines, a sentencing court is entitled to apply sentencing enhancements on the basis of relevant conduct. *See* USSG § 1B1.3. Relevant conduct includes, inter alia, acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* § 1B1.3(a)(2). The Guidelines recognize that the "common scheme or plan and same course of conduct are two closely

---

properly calculated the amount of loss, however, we uphold the restitution and forfeiture award.

23

related concepts," and separately define those concepts. *Id.* § 1B1.3 cmt. n.9 (internal quotation marks omitted). On one hand, offenses are part of a common scheme or plan when they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." *Id.* § 1B1.3 cmt. n.9(A) (emphasis omitted). On the other hand, "[o]ffenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* § 1B1.3 cmt. n.9(B).

In support of the two-level relevant conduct enhancement, the prosecution argues that the sentencing court correctly viewed the lottery scam and the Bennett identify theft evidence as part of a common scheme or plan, which was shown, inter alia, by an analysis of all the evidence and by the conspirators' use of the same email address. We agree that the Bennett identify theft evidence was "part and parcel of the overall conspiracy." *See* J.A. 1308. We are therefore satisfied that the court did not clearly err in applying the two-level enhancement for use of a false identification.

IV.

Pursuant to the foregoing, we affirm the judgment of the district court as to Sterling in No. 15-4565, and we also affirm the court's judgment as to Stewart in No. 15-4566.

AFFIRMED

24